**James A. LAMBERT, Appellant,**

v.

**Sarah EVERIST, Appellee.**

No. 86–1854.

Supreme Court of Iowa.

Jan. 20, 1988.

Rehearing Denied Feb. 12, 1988.

Bradford Kollars, Sioux City, for appellant.

Leroy J. Sturgeon of Smith & Smith, Sioux City, for appellee.

Considered by McGIVERIN, C.J., and HARRIS, SCHULTZ, LAVORATO and ANDREASEN, JJ.

McGIVERIN, Chief Justice.

This case comes before us on petitioner-father's application for further review of the court of appeals decision. Petitioner and respondent-mother are the unwed parents of a six year old minor child. Petitioner sought custody of the child under Iowa Code section 675.40 (1985) in the trial court and was awarded joint legal custody with the respondent. Primary physical care, however, was left with respondent and petitioner appeals the physical care award.

The court of appeals affirmed the trial court's ruling. We granted petitioner's application for further review and now vacate the court of appeals decision. We affirm in part and reverse in part the trial court's ruling. Because we award physical care to petitioner, we also remand for the trial court to consider visitation with the child by respondent. In oral argument before

us, petitioner stated he was not asking for child support from respondent at this time.

I. *Factual background.* Petitioner James Lambert and respondent Sarah Everist met in 1979 while both were working for a television station in Sioux City, Iowa. They became romantically involved and Sarah subsequently became pregnant. Choosing not to get married, the couple lived together in James' residence. Sarah quit her job at the television station shortly thereafter, and James supported the couple through the period of Sarah's pregnancy.

Indicative of the lifestyle differences between the couple, Sarah insisted, over James' objections, upon an in-home birth assisted by a midwife. James eventually honored Sarah's wishes and even helped with the in-home birth on April 6, 1981.

After their daughter, Laural, was born, the couple rented a small farmhouse outside the city. James continued to work while Sarah stayed at home to raise the child.

During the one and one-half years that the couple lived outside the city, Sarah's lifestyle and personal philosophies became increasingly unconventional. She frequently argued with James over his traditional dress and his conformity to the expectations of the nine-to-five work world.

Complicating matters, Sarah's primary adult companionship while James was working was a nearby couple whose lifestyle was considerably outside the mainstream. Among their many nontraditional practices, perhaps the most notable for their offensiveness to James, was their "open marriage" shared with another woman who lived in their home and their dogmatic belief in herbal recipes as preventative and curative medicine. As Sarah spent more and more time with this couple, particularly with the husband, James felt increasingly alienated. Eventually, growing differences over matters ranging from sexual mores to diet, coupled with the couple's inability to compromise, drove Sarah and James apart.

James paid the bills on the farm for the month and moved into Sioux City. Not long after, Sarah also moved back into the city. James helped with the move and began visiting Laural on a regular basis thereafter. By stipulation of the parties in a prior court action, James acknowledged paternity of Laural and began paying child support to Sarah. While Sarah allowed and even encouraged regular visitations by James with Laural, she insisted upon making all of the decisions affecting their daughter's upbringing. Between the time Sarah moved back into Sioux City and the commencement of this action by James for custody and physical care, Laural spent roughly half of her time with each parent.

Over the years between the couple's separation and this action, James became increasingly dissatisfied with the decisions Sarah was making on behalf of Laural. Sarah became an advocate of "natural" food and insisted that James follow the diet Sarah prescribed for Laural or lose the visitation rights he enjoyed. When Laural became sick, Sarah fashioned home remedies consisting of herbs, roots and vitamin supplements or took her to natural healers, treating conventional medicine as a last resort.

Although James seemed more concerned about his lack of input on the above-mentioned matters than about the actual choices Sarah made for their daughter, Sarah's choice to expose Laural to practices James considered improper for a young child disturbed him. On one occasion, James accompanied Sarah and Laural to a "Rainbow Gathering." James disliked the fact that Laural was exposed to illicit drug use and adult nudity at this quasi-communal gathering, and found the sanitation practices deplorable. When James complained to Sarah, she ignored his opinion, telling him she felt their daughter could benefit from attending such events.

James seriously opposed Sarah's decisions not to immunize Laural against various childhood diseases and to keep her out of traditional schooling.

Sarah believed that immunizations were not healthy for children, and despite frequent arguments with James, refused to allow him to get Laural immunized. With-

out telling Sarah, James had Laural immunized for measles. Sarah was furious when she later learned of it. Although Sarah subsequently allowed Laural to have an orally administered vaccination on one occasion, she continued to prohibit James from giving Laural any vaccinations by injection.

Sarah and James had several arguments over Laural's schooling. James recognized his daughter's embarrassment at not being in school, when other children her age attended school, and he felt a traditional school would be best for Laural's social and intellectual development. Sarah resisted enrolling Laural in a traditional school, hoping to find a home school with a more creative learning environment. Laural is now enrolled in kindergarten in a Sioux City parochial school because Sarah enrolled her during the trial.

Although the couple communicates well concerning Laural, they continue to disagree over her appropriate care. Sarah has developed a close relationship with members of a native American Indian community in Nebraska and frequently takes Laural along on her visits. Sarah continues to believe she should control all of the decisions affecting Laural. James on the other hand, while he sees Laural's exposure to other cultures and lifestyles as positive, wants her to be raised so that she is comfortable in the dominant cultural conventions of this society.

Citing Sarah's refusal to accommodate his input into the decisions affecting Laural's upbringing, James filed this custody action in equity pursuant to Iowa Code section 675.40. The trial court granted joint custody of Laural to both parents and placed physical care with Sarah. *See* Iowa Code § 598.1(4), (5). Upon James' appeal, we transferred the case to the court of appeals, which affirmed.

Concluding that physical care should be given to James, we vacate the court of appeals decision, reverse in part the trial court's ruling and remand with directions.

II. *Physical care of Laural.* James brought this custody action pursuant to Iowa Code section 675.40 which states:

The mother of a child born out of wedlock whose paternity has not been acknowledged and who has not been adopted has sole custody of the child unless the court orders otherwise. If a judgment of paternity is entered, the father may petition for rights of visitation or custody in an equity proceeding separate from any action to establish paternity.

Paternity in James has been established. On appeal, he agrees that joint legal custody is appropriate but requests that physical care of Laural be given to him.

■ It is axiomatic that we are concerned above all else in child custody cases with the best interests of the child. Iowa R.App.P. 14(f)(15). Our objective is "to place the child in the environment most likely to bring that child to healthy physical, mental and social maturity." *Heyer v. Peterson*, 307 N.W.2d 1, 7 (Iowa 1981). Although petitioner and respondent were never married, no higher burden of providing fitness as a parent rests upon the father. *Id.* The legal analysis employed in resolving a question concerning the custody of a child born of such a union is the same as that which would have been utilized if the child's parents had been married and a dissolution of their marriage had resulted. *Id.* Because this is an equity proceeding under the terms of Iowa Code section 675.40, our review is de novo. Iowa R.App.P. 4. Consequently, we are not bound by the trial court's factual findings, but give weight to them. Iowa R.App.P. 14(f)(7).

The factors considered in awarding custody are enumerated in Iowa Code section 598.41(3) and in *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974), and need not be listed here. They include the educational, medical, material and social needs of the child.

■ Clearly, Laural has benefited from her association with both parents. As the trial court noted, "James offers Laural the stability, security, direction and affection every child should have. Sarah offers Laural the inquisitiveness, freedom, fanta-

sy, sensitivity and affection every child should experience." Laural has weathered the differences between her parents quite well, and all of the witnesses produced at the trial agreed that Laural was a bright, lively and healthy child. We agree that joint custody is in her best interest.

As for physical care, we acknowledge that this case presents a close question. Both parents are dedicated to providing for Laural. She has grown and developed well under the present care arrangement. The seventh factor under *Winter* cautions us to consider the effect on the child of disrupting the existing custodial status. 223 N.W.2d at 166. The trial court placed considerable emphasis on this factor. Considering all the factors under the entire record, however, we feel that James is the parent who "can minister more effectively to the long-range interests" of Laural. *Id.*

Laural's schooling is an important factor in this case. The trial court found that "Sarah's acceptance of Laural's enrollment in the local parochial school during a lengthy recess in this trial must be looked upon as being under duress, at either a conscious or unconscious level," and we agree. The psychologist who evaluated Laural before trial found her to be a precocious child who wanted, and would greatly benefit from, the social and intellectual experience of schooling. James' insistence upon regular schooling as Laural's social and educational needs develop is an important consideration.

Clearly, both parents are concerned with Laural's health. Whatever the benefits of nonconventional or "natural" medicine, however, immunizations have a proven record. The fears of our parents caused by childhood diseases such as poliomyelitis are unknown to modern couples because of immunization programs. We find it significant in his favor that James insisted upon immunizing Laural even over Sarah's wishes.

James has a job and regular income. We have no intention to intimate a preference for James' lifestyle choices. Nevertheless, we believe his acceptance of the conventional work world as contrasted to Sarah's sporadic employment will make him better able to provide for the long term material needs of Laural.

Additionally, James has significant ties to the community which will be beneficial to Laural's social development. James' parents and three of his siblings live in Sioux City. He frequently involves Laural in family gatherings as well as other community functions. Notably, Laural appears to enjoy her frequent visits to her paternal grandparents as much as they do.

Sarah by contrast is less social. Her values and interests are not shared by many members of the community. Consequently, she exposes Laural to few childhood social events. The expert psychologist who testified at trial noted developing resentment on Laural's part toward her mother because of Sarah's failure to recognize Laural's developmental needs for peer relationships as well as schooling.

Finally, we find it significant that the psychologist who evaluated the parties recommended joint custody if at all possible, and if not, custody solely by James. He found James to be the more mature and stable adult of the two. Now that Laural has entered school, her needs are changing. While Laural will continue to spend considerable time with both parents, James' relative stability makes him the better parent to have physical care of the child.

By concluding that James should have physical care of Laural, we open up the question of visitation with the child by Sarah. Certainly, Sarah, as Laural's natural mother, should have visitation rights. *Cf. Gay v. Cairns*, 298 N.W.2d 313, 315 (Iowa 1980) (fact that child was born out of wedlock no longer affects natural father's right to visitation). Iowa Code section 598.41(1) authorizes the court to order "liberal visitation rights where appropriate...."

On appeal, however, the parties have not addressed the question of visitation by Sarah. Because considerable time has passed since the original decree, we remand to the

trial court to consider this issue in light of what we have said here.

III. *Disposition.* We believe that changing Laural's existing physical care arrangement will have little, if any, effect upon her relationships with her parents while it will provide for her best long-term interests. Accordingly, we vacate the court of appeals decision. We affirm the trial court's joint legal custody ruling, reverse the physical care determination, and remand for consideration of appropriate visitation by respondent at this time under the present and such additional record as may be appropriate. The trial court shall enter further orders in conformance with this opinion.

COURT OF APPEALS DECISION VACATED; DISTRICT COURT JUDGMENT AFFIRMED IN PART, REVERSED IN PART AND REMANDED.