**IN THE COURT OF APPEALS OF IOWA**

No. 14-0995
Filed March 11, 2015

**BRANDON R. WATERS,**
      Plaintiff-Appellee,

**vs.**

**JENNIFER M. ALITZ,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Warren County, Sherman W. Phipps, Judge.

      A mother appeals a district court order granting physical care of a child to the child's father. **AFFIRMED.**

      Andrew B. Howie of Hudson, Mallaney, Shindler & Anderson, P.C., West Des Moines, for appellant.

      Jami J. Hagemeier of Williams & Hagemeier, P.L.C., Des Moines, for appellee.

      Heard by Vaitheswaran, P.J., and Tabor and Mullins, JJ.

**VAITHESWARAN, P.J.**

A mother appeals a district court order granting physical care of a child to the child's father.

### I. Background Facts and Proceedings

Jennifer Alitz and Brandon Waters met in 2007 and began an on-again/off-again relationship. Waters moved to Colorado where Alitz lived. The couple separated within a few months and Waters returned to Iowa.

Almost three years later, the couple reunited and moved in with Waters's parents in Iowa. In 2012, they had a daughter, and in 2013 they again separated.

Waters petitioned for custody of the child. The district court temporarily placed her with Alitz, subject to visitation with Waters. Alitz was subsequently found in contempt for denying Waters visits.

Following trial, the district court granted Waters physical care of the child. Alitz appealed.

### II. Physical Care

#### A. Judicial Notice

As a preliminary matter, we must address the scope of our record. Alitz's main brief referred to a matter occurring after trial in another case. When Waters pointed out the matter was not in our record, Altiz's attorney argued we could take judicial notice of it.

Iowa Rule of Evidence 5.201(f) allows a court to take judicial notice of adjudicative facts "at any stage of the proceeding." *See also State v. Washington*, 832 N.W.2d 650, 655-56 (Iowa 2013) ("Judicial notice may be taken

on appeal."). However, "[t]he general rule is that it is not proper for the court to consider or take judicial notice of the records of the same court in a different proceeding without an agreement of the parties." *Id.* (*citing Leuchtenmacher v. Farm Bureau Mut. Ins. Co.*, 460 N.W.2d 858, 861 (Iowa 1990)).

There was no agreement of the parties, nor could there have been because Alitz's attorney did not reveal his intent to rely on the matter until the appeal. No post-trial or post-judgment rulings were filed and Waters had no opportunity to be heard on the citation or inclusion of this new information. *See* Iowa R. Evid. 5.201(e) ("A party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed."). Under these circumstances, we decline to take judicial notice of the matter.[1] The record is limited to the evidence adduced at trial. Our review of this record is de novo. Iowa R. App. P. 6.907.

### B. Analysis

Our analysis of a physical care ruling is the same whether the parents are married or unmarried. *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988); *see also* Iowa Code § 600B.40 (2013). In both instances, we focus on the child's best interests. *Id.* We give weight to the district court's credibility findings but are not bound by them. Iowa R. App. P. 6.904(3)(g).

Those credibility findings are key in a case such as this, which is rife with accusations and counter-accusations of misconduct. In particular, the district court found Alitz "exaggerated" her accusations against Waters, "perhaps hoping

---

[1] We have considered *State v. Freland*, No. 13-0904, 2014 WL 1494953 (Iowa Ct. App. 2014), cited by Alitz. That opinion is inapposite because this court took judicial notice of a Wisconsin statute, rather than a fact.

to gain a tactical advantage in these proceedings." The court determined her behavior was "not in the child's best interests," showed "a consistent pattern of attempted interference with the relationship between [Waters] and [the child]," and was "indicative of [Alitz's] desire to exclude [Waters] from the child's life." Even though we lack the ability to observe witness demeanor, we discern support for these findings and determinations in Alitz's testimony, which we will summarize below in the context of the pertinent statutory factors.

We begin with the primary considerations in this case—whether Alitz would communicate with Waters and support his relationship with the child. *See* Iowa Code § 598.41(3)(c), (e). One indicator is the parent's willingness to facilitate visitation. *See* Iowa Code § 598.41 (stating liberal visitation will "assure the child the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated . . . and which will encourage parents to share the rights and responsibilities of raising the child.").

As noted, Alitz was held in contempt for denying Waters visitation. Alitz attempts to minimize her violations, pointing to confusion about the effect of a no-contact order and advice from a department of human services employee. However, Alitz admitted to knowingly disobeying a visitation order, and the department employee she identified as advising her to do so denied making such a statement.

Equally troubling is the scorn with which Alitz viewed visitation, despite the absence of any restrictions on visits. Specifically, Alitz testified it would be in the child's best interests to have "shorter visits and less overnights." She cited the child's "extreme separation anxiety," which "never improved" and the child's "fear

of [Waters] at exchanges, every single exchange, for the entire time." She suggested the child "seiz[ed] up" during exchanges and "when [Waters] touches her skin, she wails" and "starts screaming, crying out." Later, she stated Waters would "hurt" the child and would "continue to hurt her." She said "[h]e does not have control. He's dangerous." She also testified, "I never trusted Brandon with [the child] when she was young. I never, and still don't." And, she said, "I did not trust Brandon since the minute I delivered." She acknowledged the court had earlier changed the visitation schedule to reduce the number of exchanges and admitted this improved the situation. But, she continued, "every time I get her back, I still have a forty-eight-hour period of recovery." She reiterated "overnights are too much. . . . Brandon is a danger to himself and to anyone else that spends too much time around him." These views were at odds with her obligation to support Waters's relationship with the child.

We recognize Waters was the subject of a domestic and child abuse complaint leveled by Alitz—a complaint the Department of Human Services investigated and deemed founded. The incident, which occurred during a visitation exchange, was documented by Alitz on her cell phone, snippets of which were introduced at trial. Those snippets captured Waters as he attempted to reach towards Alitz with the child in his arms. Alitz told the department investigator Waters's aim was to obtain and destroy her cell phone. In the process, she reported, Waters scratched her fingers and bruised her shin.

There is no question Waters let his temper get the best of him in a highly fraught situation. We do not condone his avoidable decision to risk the safety of his child and of Alitz. But, as the author of the child abuse report observed,

"[w]atching this film, this writer hoped this was a rare and isolated example of custody exchange." Upon our review of the record, we trust it was. To the extent Alitz relied on this incident to label Waters dangerous and untrustworthy, we concur in the district court's finding that Alitz's "characterizations of petitioner's behaviors are exaggerated." *See In re Marriage of Forbes*, 570 N.W.2d 757, 760 (Iowa 1997) ("It is for the court to weigh the evidence of domestic abuse, its nature, severity, repetition, and to whom directed, not just to be a counter of numbers."); *In re Marriage of Ford*, 563 N.W.2d 629, 632-33 (Iowa 1997) (stating "evidence of domestic abuse does not trump the other statutory and common law factors.").

Those characterizations were not limited to her trial testimony. In a letter seeking to intervene in Waters's appeal of the founded child abuse report, she wrote Waters "terroriz[ed] this infant" and was a "high risk to" the child. She asserted the child had been "under ongoing abuse & neglect at the hands of her father for almost a year," was "at risk for severe lifelong damage to her development both emotionally and physically," was "in DIRE need of protection from her father" and was "not being given the proper protection from further injury or death."

This language could only be construed as hyperbole. At trial, a department representative testified there was no longer an open case involving this child because the department determined it "could reach safe case closure through the work that" had been done with Alitz and Waters, and no more services were necessary. The department's work on behalf of the family included an on-site inspection of both parents' homes. The employee who

inspected Waters's home found him to be an appropriate person to care for his daughter. Indeed, the department found a subsequent complaint by Alitz against Waters to be unfounded. In sum, the department laid to rest any concerns about the fitness of Waters as a parent.

Based on this record, we agree with the district court's finding of Alitz's "adamant lack of interest in supporting the relationship between [the child] and her father as demonstrated by her overall conduct both before and after these proceedings began."

This finding is further supported by Alitz's responses to questions about a potential move to Colorado. When asked if she had "immediate plans" to move, she responded, "I have no 'immediate plans.'" Moments later, she stated she and Waters never intended to raise the child in Iowa, she owned a home in Colorado, she had a "wonderful job there," she "love[d] the state," and she had "a lot of family out there." While she claimed she would seek court approval before making a move, her previous decision to flout the court's visitation order raises doubts as to whether she would abide by her promise. We conclude Alitz's failure to communicate and support Waters's relationship with the child militated in favor of granting Waters physical care.

The most significant countervailing consideration was Alitz's role as primary caretaker of the child. *See* Iowa Code § 598.41(3)(d). However, "[s]uccessful parenting . . . implicates far more than a parent's ability to attend to the daily details of raising a child." *In re Marriage of Kunkel*, 555 N.W.2d 250, 253 (Iowa Ct. App. 1996). "The parent awarded physical care must also possess those parental attributes that are consistent with the obligations inherent in a joint

custody arrangement. Most notable among these is the ability to set aside understandable resentments and act in the best interest of the child." *Id.* Because Alitz showed herself to be incapable of setting aside her animosity towards Waters, her role as primary caretaker is not dispositive.

On our de novo review, we conclude the district court acted equitably in granting Waters physical care of the child. In reaching this conclusion we have found it unnecessary to rely on the opinion of Waters's expert—an opinion Alitz challenges on appeal. That said, the district court acted well within its authority in giving weight to the opinion, which was rendered after interviewing Alitz as well as Waters and after obtaining the results of psychological testing. *See Nicolou v. Clements*, 516 N.W.2d 905, 909 (Iowa Ct. App. 1994) ("[C]ertainly [experts'] testimony must be accorded weight, but their final conclusions are not binding on the trial of fact nor on the appellate courts.").

### III. Appellate Attorney Fees

Both parties request appellate attorney fees. An award rests in our discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). Waters is the prevailing party but because Alitz was unemployed at the time of trial, we decline his request to have her pay a portion of his appellate attorney fees.

**AFFIRMED.**