**IN THE COURT OF APPEALS OF IOWA**

No. 15-1967
Filed June 29, 2016

**ROBERT JOSEPH DEAN,**
      Plaintiff-Appellee,

**vs.**

**LARA WINTER BARTUSEK,**
      Defendant-Appellant.
_____

      Appeal from the Iowa District Court for Story County, Steven J. Oeth, Judge.

      The mother of a five-year-old boy challenges the district court's order granting physical care to his father and, alternatively, seeks extraordinary visitation. **AFFIRMED AS MODIFIED AND REMANDED.**

      Megan R. Rosenberg of Cady & Rosenberg Law Firm, P.L.C., Hampton, for appellant.

      Elizabeth A. Kellner-Nelson of Kellner-Nelson Law Firm, P.C., West Des Moines, for appellee.

      Considered by Tabor, P.J., and Bower and McDonald, JJ.

**TABOR, Presiding Judge.**

After comparing the parents' work schedules, the district court awarded physical care of five-year-old A.B.D. to his father, Robert Dean, subject to "reasonable parenting time" for his mother, Lara Bartusek. On appeal, Bartusek asks us to place physical care of A.B.D. with her. If Dean retains physical care, Bartusek alternatively seeks extraordinary visitation of three weekends per month and six weeks in the summer. Because Dean has been "significantly in charge of A.B.D.'s day-to-day affairs for the past two years," like the district court, we decline to upend that routine. But we do find extraordinary visitation as requested by Bartusek would be in A.B.D.'s best interests. Accordingly, we remand for modification of the order on visitation and child support.

## I.      Facts and Prior Proceedings

Dean and Bartusek were never married, but lived together in Clear Lake when A.B.D. was born in October 2010. When A.B.D. was six-months old, Dean moved to Ames to attend Iowa State University. Dean earned his bachelor's degree in May 2015 and two months later started working at Principal Financial Group in Des Moines, earning $42,600 per year. He commutes from Ames, and he works weekdays from 8:00 a.m. to 4:45 p.m. He has discussed the possibility of moving to Ankeny to shorten his commute, but he had no definite plans at the time of trial.

Dean served in the Army from 2004 until 2008, including a fifteen-month deployment in Iraq. After returning from his service, he was diagnosed with anxiety, depression, and posttraumatic stress disorder (PTSD). As a result of that diagnosis, he receives disability benefits from the Veteran's Administration in

the amount of $13,600 per year. Dean testified regarding two instances in 2008 and 2009 when he sought in-patient mental health treatment for PTSD and suicidal thoughts. Dean testified he takes medication and has been successful in treating his mental health conditions.

Bartusek started a career in law enforcement as a dispatcher and jailer when she was nineteen-years old. She has an associate's degree in law enforcement from North Iowa Area Community College, among other certifications and credits. She graduated from the Iowa Law Enforcement Academy and has been working as a police officer in Eagle Grove since 2013. She earns about $35,000 per year as a police officer. Her hours are 6:00 p.m. to 6:00 a.m. on a rotating schedule of five days on and five days off, then four days on and four days off. Bartusek testified when she works the night shift she has "people that would come [to her home] and basically be there while he's sleeping." Her extended family lives about an hour away in Mason City.

Bartusek obtained a domestic abuse protective order in March 2012, after Dean engaged in "incessant texting and calling wanting to know where [she] was or who she was with" and then pushed down the door of her home in Clear Lake when she would not answer him. During the year-long duration of the order, Bartusek allowed Dean to maintain contact with A.B.D. Shortly after the order expired, Bartusek moved to Eagle Grove so Dean could connect with A.B.D. more easily. At that time in 2013, Dean assumed more of the childcare responsibilities. A.B.D. lives with Dean during the week, attending daycare in Ames, and Bartusek exercises regular weekend visitations, as well as coming to Ames on her days off. Bartusek also testified to an incident in December 2014 or

January 2015 when Dean prevented her from saying goodbye to A.B.D. and threatened to "call the cops" to report her for trespassing and assault.

Shortly on the heels of that incident, Dean filed a petition to establish custody, visitation, and child support. The district court held a hearing on the matter on October 21, 2015, taking testimony from both parents and A.B.D.'s maternal grandmother. The court issued an order on custody, visitation, and support on October 23, 2015. In its findings of fact, the court stated both parents were "good people" and were "generally supportive of each other's parenting." The court awarded joint legal custody and granted physical care of A.B.D. to Dean, "based significantly on the conclusion that [his] schedule" was more "advantageous for raising a child." The court noted Bartusek was "a young police officer. Young police officers generally get assigned night hours. The court understands that requirement. It is just that 'having people there while A.B.D. sleeps' is not as good as having a parent available."

The court considered Bartusek's argument that she should be the primary caregiver in light of Dean's acts of domestic violence that resulted in her obtaining a protective order in 2012 and her ongoing concerns about Dean's mental health. But the court did not find her concerns decisive on the issue of physical care. The court noted Dean had been "significantly in charge of A.B.D.'s day-to-day affairs" for the past two years—including daycare, doctor's appointments, and T-ball—and by both parents' estimation, A.B.D. was "doing well."

The grant of physical care to Dean was subject to Bartusek having "reasonable parenting time." The court stated it was "hopeful" the parents could

agree on a parenting schedule consistent with Bartusek's rotating work schedule that would provide for her "to continue having significant physical and emotional contact with A.B.D." In the event the parents could not agree to a schedule, the court ordered the following scheduled visitation:

> A. When A.B.D. is in school/daycare:
> a. Alternating weekends from Friday evening at 5:00 p.m. until Sunday evening at 5:00 p.m.
> b. Every Wednesday evening from 4:00 p.m. to 7:00 p.m. If Lara has the day off, she can keep A.B.D. overnight and return him to school or daycare on Thursday morning. Lara must provide all transportation for the mid-week parenting time.
> B. Summer months when A.B.D. is not in school:
> a. From 6:00 p.m. of the day Lara completes her 4 or 5 day rotating schedule until 5:00 p.m. on the day before Lara begins her 4 or 5 day work schedule.

Bartusek now appeals.

## II.  Scope and Standard of Review

We employ the same legal analysis in resolving questions concerning the custody of a child born to unmarried parents as we do in the case of divorcing parents. *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). Because this proceeding was in equity, our review is de novo. Iowa R. App. P. 6.907. We are not bound by the district court's factual findings, but give weight to them. *Lambert*, 418 N.W.2d at 42.

## III.  Analysis of Mother's Claims

## A.  Physical Care

When deciding the question of physical care we look to the factors listed in Iowa Code section 598.41(3) (2015),[1] and *In re Marriage of Winter,* 223 N.W.2d

---

[1] The statutory factors in Iowa Code section 598.41(3) include:

165, 166-67 (Iowa 1974),[2] to assess which parent is more likely to provide an environment ensuring A.B.D.'s physical and mental health and bringing him to

---

> a. Whether each parent would be a suitable custodian for the child.
> b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
> c. Whether the parents can communicate with each other regarding the child's needs.
> d. Whether both parents have actively cared for the child before and since the separation.
> e. Whether each parent can support the other parent's relationship with the child.
> f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
> . . . .
> h. The geographic proximity of the parents.
> i. Whether the safety of the child, other children, or the other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
> j. Whether a history of domestic abuse, as defined in section 236.2, exists. . . ."

[2] The *Winter*, 223 N.W.2d 165, factors include:

> 1. The characteristics of each child, including age, maturity, mental and physical health.
> 2. The emotional, social, moral, material, and educational needs of the child.
> 3. The characteristics of each parent, including age, character, stability, mental and physical health.
> 4. The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
> 5. The interpersonal relationship between the child and each parent.
> 6. The interpersonal relationship between the child and its siblings.
> 7. The effect on the child of continuing or disrupting an existing custodial status.
> 8. The nature of each proposed environment, including its stability and wholesomeness.
> 9. The preference of the child, if the child is of sufficient age and maturity.
> 10. The recommendation of the attorney for the child or other independent investigator.
> 11. Available alternatives.
> 12. Any other relevant matter the evidence in a particular case may disclose.

social maturity. *See In re Marriage of Hansen,* 733 N.W.2d 683, 695-96 (Iowa 2007). Additionally, "the factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* at 700. In reaching our decision, gender is irrelevant and neither parent has a "greater burden than the other in attempting to gain custody." *In re Marriage of Bowen,* 219 N.W.2d 683, 689 (Iowa 1974).

Bartusek acknowledges both parents have acted as A.B.D.'s primary caretaker at different times during his life, with A.B.D. being primarily in Dean's care since September 2013. But she contends the district court erred in placing physical care with Dean because she has been the more stable parent overall. She points to her continuous employment, steady living arrangements, and regular financial contributions to A.B.D.'s welfare. She contrasts those factors with Dean's numerous part-time jobs, return to college, short amount of time in his current employment, and proposed plan to relocate closer to his work. She also emphasizes Dean's mental health issues and his past hospitalizations. Bartusek also renews her argument that she has been a "long-time victim of Robert's aggression, intimidation, and harassment."[3] At the same time, she contends she is committed to ensuring maximum contact between A.B.D. and Dean.

Dean responds, recently he has been A.B.D.'s primary caretaker and the district court was correct in maintaining the continuity of that arrangement. He denies a "history" of domestic violence against Bartusek, though at trial he

---

[3] Bartusek offered into evidence some coarse emails she received from Dean when she was trying to discuss A.B.D.'s visitation. Dean acknowledged the crassness of the communication, but asserted he sent the messages at a time the couple was maintaining a sexual relationship and he never intended to deny Bartusek time with A.B.D.

acknowledged the incidents that led to the imposition of the protective order. On the issue of his mental health, Dean is candid about his hospitalizations before the birth of A.B.D. But he explained he has addressed his mental health by seeking professional treatment and taking medications. Dean also points to the district court's specific factual finding that his treated conditions do not "impact his ability to parent A.B.D."

After our de novo review of the record, we agree with the district court that both parents have been and would be suitable guardians for A.B.D. Both parents, who are now in their early thirties, have ensured A.B.D. is well cared for and his talents are nurtured. Both parents have demonstrated a strong commitment to his well-being and, for the most part, have been good role models. We are also heartened that both parents have taken steps to foster A.B.D.'s positive relationship with the other.

We do not take lightly Dean's threatening actions toward Bartusek, resulting in the 2012 protective order. But we do not find his actions rise to the level of a "history" of domestic violence under section 598.41(3)(j). *Cf. In re Marriage of Forbes,* 570 N.W.2d 757, 760 (Iowa 1997) (discussing effect of domestic violence on joint custody award). On the related issue of Dean's PTSD, we believe the record shows Dean is attuned to his difficulties and has actively strived to address his mental health. Like the district court, we do not find his diagnosis disqualifies him from providing physical care to A.B.D. Indeed, Bartusek agreed to Dean taking primary care of A.B.D. in 2013 after the expiration of the protective order. The record does not support her assertion that Dean "bullied" her into allowing him more time with A.B.D.

When both parents are suitable candidates for an award of physical care, it is reasonable for the court to choose the parent with the work schedule that provides more flexibility and is better suited to child care. *See, e.g.*, *Agyepong-Yeboah v. Roeder*, No. 14-1882, 2015 WL 7575493, at *4 (Iowa Ct. App. Nov. 25, 2015); *In re Marriage of Miller*, No. 14-0468, 2015 WL 3885355, at *3 (Iowa Ct. App. June 24, 2015); *In re Marriage of Clark*, No. 12-2192, 2013 WL 3291834, at *3 (Iowa Ct. App. June 26, 2013). We agree with the district court's assessment that Dean's conventional work hours were more conducive to providing physical care for A.B.D. than were Bartusek's rotating-night-shift schedule as a police officer. Granting physical care to Dean will also be less disruptive to the child's routine established before the hearing. We affirm the district court's physical care determination.

## B. Extraordinary Visitation

Bartusek alternatively asks for extraordinary visitation in the form of three weekends per month and six weeks in the summer. Bartusek points out Dean testified, if he were awarded physical care, she should have visitation with A.B.D. for three weekends per month at her house. Dean changes his position on appeal, contending Bartusek's request for three weekends per month during the school year "would deny A.B.D. the opportunity to spend weekend time with his father."

We agree with Bartusek that she is entitled to additional time with A.B.D. *See* Iowa Code § 598.41(a) (stating "insofar as is reasonable and in the best interest of the child," the court "shall order" liberal visitation rights, "which will assure the child the opportunity for the maximum continuing physical and

emotional contact with both parents after [separation or divorce], and which will encourage parents to share the rights and responsibilities of raising the child"). The district court expressed its hope the parents would agree on parenting time consistent with Bartusek's rotating schedule but imposed a traditional alternating weekend and midweek visitation schedule in the event they did not reach such an agreement.

Given Bartusek's rotating work schedule, we believe it would be in A.B.D.'s best interest to grant visitation for an additional weekend per month during the school year to maximum his continuing contact with his mother. The additional visitation will more accurately approximate the parents' voluntary caregiving arrangement before the custody order. We also find it appropriate to increase Bartusek's visitation to six weeks in the summer to allow more interaction between A.B.D. and his mother, as well as with her extended family.

We remand to the district court to modify the visitation schedule and to recalculate child support in light of the additional parenting time allocated for Bartusek. If the award of child support needs to be recalculated due to the application of the extraordinary visitation credit, the district court is to modify the obligation "based on the present financial circumstances of the parties and the child support guidelines." *See In re Marriage of Hoffman,* 867 N.W.2d 26, 37 (Iowa 2015).

### IV. Appellate Attorney Fees

Finally, Dean asks for $1500 toward his appellate attorney fees. In a custody proceeding between parents who have never married, the court may award the prevailing party reasonable attorney fees. Iowa Code § 600B.26. In

this case, Dean prevailed on the issue of physical care but not on the issue of extraordinary visitation. We also note he receives more annual income than does Bartusek. On these facts, we decline to award appellate attorney fees. Costs on appeal shall be split equally between the parties.

**AFFIRMED AS MODIFIED AND REMANDED.**