# IN THE COURT OF APPEALS OF IOWA

No. 21-0933
Filed April 13, 2022

**JESSE JOE BLAIR,**
    Petitioner-Appellee,

**vs.**

**TRISH BECK n/k/a TRISH HALDER,**
    Respondent-Appellant.
_____

Appeal from the Iowa District Court for Clay County, Charles Borth, Judge.

A mother appeals a district court ruling modifying physical care of her daughter. **AFFIRMED.**

Jared R. Weber of Weber Law Office, Orange City, for appellant.

Matthew G. Sease of Sease & Wadding, Des Moines, for appellee.

Considered by Bower, C.J., and Greer and Badding, JJ.

**BADDING, Judge.**

Jesse Blair and Trish Beck, now known as Trish Halder, are the never-married parents of J.B., born in 2013. After initially agreeing to a joint-physical-care arrangement when they separated, the parties each sought physical care of their daughter upon Trish's move from Iowa to Minnesota in 2016. In the ensuing litigation, the district court placed physical care with Trish. When Trish returned to Iowa in 2019, Jesse sought modification of the prior ruling. Echoing the informal arrangement the parties had before Trish's move to Minnesota, the district court returned J.B. to the parties' joint physical care. Trish appeals, claiming Jesse did not meet his heavy burden of proving the change in physical care was in their daughter's best interests. We disagree and affirm the modification ruling.

## I. Background Facts and Proceedings

Jesse and Trish separated when J.B. was one year old. Although Trish assumed physical care at first, the parties soon switched to an informal joint-physical-care arrangement under which Jesse had J.B. in his care two to three days each week, while Trish cared for her the other days. That arrangement lasted until spring 2016 when Trish moved to Minnesota to live with her then-husband. Jesse remained in Spencer, Iowa, a two-and-a-half-hour drive away. Given the new distance between their homes, Trish and Jesse agreed to alternate physical care on a weekly basis while their custody action was pending.

Despite their willingness to co-parent, the parties acknowledged that set-up was not ideal. In an August 2018 ruling, the district court agreed and granted Trish's request for physical care, with visitation for Jesse. The court reasoned that

"while Jesse has been providing a greater share of [J.B.]'s care since the parties separated, it is Trish who has been the primary caregiver of the child to this point in her life." Its reasoning continued: "The court further finds that Trish has been the one to provide consistent financial support for [J.B.], that she will continue to promote Jesse's relationship with [J.B.], and that she has been consistently the party who has assumed the role of parent for the child not just a friend." This court affirmed that ruling in *Blair v. Scott*, No. 18-1401, 2019 WL 1752705, at *1 (Iowa Ct. App. Apr. 17, 2019). Yet in doing so, we remarked that Jesse and Trish were two competent, loving, and "relatively equal parents." *Blair*, 2019 WL 1752705, at *2.

In September 2019, Jesse petitioned to modify the district court's ruling on physical care, visitation, and child support. In his prayer for relief, he asked that physical care of J.B. be placed with him, "or in the alternative there be shared physical care." He alleged it was no longer in J.B.'s best interests for Trish to have physical care because Trish had "changed residency" for the third time—later a fourth time—and had also "ceased the relationship which she testified was stable and conducive to providing a suitable environment for the minor child."

Earlier that year, Trish had divorced her husband and moved back to Iowa once J.B. completed kindergarten. She received physical care of their daughter, A.W., born in 2016. After returning to the Spencer area, Trish remarried and moved into a home with her new husband, his two teenage sons, and the two girls. The boys resided there half the time, and the girls shared a bunk bed. According to Trish, J.B. and her half-sister are "two peas in a pod" and "very bonded" with one another.

During that time, J.B. visited Jesse every other weekend at his home in Spencer, where she has her own bedroom. Like Trish, Jesse was also in a new relationship and lived with his girlfriend and her daughter, along with his six-year-old son from a prior relationship, O.B., who stayed with them every other week. Jesse described J.B. and O.B. as "like every other sibling"—they "have good moments, and they have a little bit of attitudes towards each other sometimes."

At the modification trial in April 2021, Jesse acknowledged that Trish had been the primary caretaker since the summer of 2018 when the district court granted her physical care. Yet he questioned her ability to provide J.B. with a long-term stable home environment, highlighting her changes in residence and paramours. And although he testified it would be in J.B.'s best interests to be placed in his physical care, he added, "I do not see why we would not be able to return back to 50/50."

Trish, for her part, resisted the idea of returning to joint physical care. She elaborated that Jesse had a history of not getting out of bed in the mornings, which she believed caused J.B. to be late for school on one occasion. After that incident, she refused to give Jesse extra time with J.B. on school days or when she already had plans. She also brought up Jesse's lack of involvement with J.B.'s schooling, sporting events, and medical appointments. In that same vein, she said that Jesse didn't always take full advantage of his time with J.B., pointing to the summer of 2020 when he only exercised two weeks of vacation with J.B. instead of the three that he was allotted.

Based on the evidence presented at trial, the district court ruled "that Jesse has not met his heavy burden of showing he has the ability to offer care to J.B.

superior to that being offered by Trish." But the court, citing the principles set forth in *In re Marriage of Terrones*, No. 20-0538, 2020 WL 7021557, at *2 (Iowa Ct. App. Nov. 30, 2020), determined that Jesse sufficiently proved joint physical care was in J.B.'s best interests. Trish challenges that modification.

## II. Scope and Standard of Review

Because petitions to modify physical care are tried in equity, our review is de novo. *In re Marriage of Hoffman*, 867 N.W.2d 26, 32 (Iowa 2015). We give weight to the district court's fact findings, especially when considering witness credibility, but those findings do not bind us. *In re Marriage of Brown*, 778 N.W.2d 47, 50 (Iowa Ct. App. 2009). We apply the same legal analysis when resolving physical-care disputes in cases involving married parents as we do in cases involving unwed parents. *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988).

## III. Analysis

Before examining the merits of Trish's appeal, we first address her threshold argument that Jesse should have been precluded from requesting joint physical care at trial because "his discovery responses, trial presentation, and his specific prayer for relief was a rejection of joint physical care." This argument fails, as Jesse's petition for modification clearly states: "the Petitioner prays that the Court enter a Decree of Modification modifying the child custody arrangements to joint custody with the parties, physical care placed with the Petitioner subject to reasonable and proper visitation with the Respondent *or in the alternative there be shared physical care*." (Emphasis added.) This request was repeated at the parties' court-ordered mediation and again at trial during opening statements, questioning of witnesses, and closing arguments. Thus, Jesse's request for joint

physical care was properly before the district court. In any event, we find the record adequate to address the issue. *See In re Marriage of Troen*, No. 10-1617, 2011 WL 1818214, at *2 (Iowa Ct. App. May 11, 2011). We now proceed to the merits.

### A. Physical Care

As the district court noted, the party seeking modification of physical care bears a heavy burden. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). We have reiterated "that once custody has been fixed it should be disturbed for only the most cogent reasons." *Brown*, 778 N.W.2d at 52. When, as here, a parent is requesting a change from the other parent's physical care to their joint physical care, the requesting parent must show (1) a substantial change in circumstances occurred that necessitates the change and (2) joint physical care is in the child's best interests. *Terrones*, 2020 WL 7021557, at *2. Our recent decisions have recognized that because joint physical care essentially places the parents "on equal footing," the requesting parent need not prove an ability to provide superior care, as is required when one parent seeks to wrest physical care from the other. *See, e.g.*, *In re Marriage of Kelly*, No. 19-1295, 2020 WL 3571863, at *2 (Iowa Ct. App. July 1, 2020). *But see In re Marriage of Prussman*, No. 14-1760, 2015 WL 2089712, at *2–3 (Iowa Ct. App. May 6, 2015).

Trish concedes that her return to Iowa after her divorce "was a change in circumstances that was more or less permanent, and not contemplated by the original decree." *See Frederici*, 338 N.W.2d at 158. Thus, the fighting issue is whether the district court's decision to modify the custody decree to place J.B. in the parties' joint physical care was in the child's best interests.

In determining whether such arrangement is in the child's best interests, we consider a nonexclusive list of factors that includes "four key considerations" where, like Trish and Jesse, both parents are suitable caregivers:

> (1) stability and continuity of caregiving; (2) the ability of [the parents] to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) the degree to which [the] parents are in general agreement about their approach to daily matters.

*In re Marriage of Geary*, No. 10-1964, 2011 WL 2112479, at *2 (Iowa Ct. App. May 25, 2011) (citing *In re Marriage of Hansen*, 733 N.W.2d 683, 696–99 (Iowa 2007)). We also generally consider the factors in Iowa Code section 598.41(3) (2019) and *In re Marriage of Winter*, 223 N.W.2d 165, 166 (Iowa 1974), which "include the educational, medical, material and social needs of the child." *Lambert*, 418 N.W.2d at 42. In balancing these factors, we strive "to place the child in an environment most likely to bring the child to healthy physical, mental, and social maturity." *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa Ct. App. 1996).

Trish argues modification was not appropriate because "J.B. spent the last approximate three years since the original decree (August of 2018) until trial (April 28, 2021) in [her] primary care." She claims the district court failed to give adequate weight to "the consistency, routine, and continuity" she provided J.B. during that time which goes to the "stability and continuity of caregiving," or "approximation," factor. On this point, the court reflected:

> "Stability and continuity of caregiving" at first glance would seem to weigh against joint physical care and in favor of continuing primary physical care with Trish. Upon deeper reflection, however, it is not quite so clear. The parties had successfully been exercising joint physical care until school attendance and geography demanded an order for primary physical care. That arrangement had otherwise been stable and continuing.

Notwithstanding the three years during which Trish had physical care of J.B., the court noted that the child's living situation had not been particularly stable. As the court explained, "[Trish] resided in two different homes during her time in Minnesota, and she has resided in two different homes since her return to the Spencer area." She had two marriages over the course of those three years, each involving young children. While there is no direct evidence J.B. was negatively affected by these changes, we agree with the district court that stability and continuity of caregiving under these facts do not weigh strongly against joint physical care as Trish suggests. *See, e.g.*, *In re Marriage of Berning*, 745 N.W.2d 90, 93 (Iowa Ct. App. 2007) (discussing mitigating factors against significance of primary caregiver role); *In re Marriage of Stephens*, No. 14-0133, 2014 WL 3511904, at *3 (Iowa Ct. App. July 16, 2014) (noting the custodial parent's frequent moves and uprooting of her children called into question her ability to provide them with long-term stability despite her history of caregiving).

Trish insists that absent any evidence in the record of "how the move or change in relationships impacted J.B.," the approximation factor should tip in her favor. But this argument ignores the reality that "[n]o move is easy, even for adults." *Frederici*, 338 N.W.2d at 160. As our supreme court recognized in *Frederici*: "Some emotional trauma can be expected whenever children are removed from familiar to unfamiliar surroundings." *Id.* Here, not only has J.B. moved residences four times since the original decree was entered, she has also been enrolled in two different school districts and introduced to two different step-fathers within a three-year period. And despite Trish's attempts to minimize Jesse's involvement as a parent by stating that he "never participated in J.B.'s

education nor the day-to-day routine while J.B. has been a school aged child," we recognize that Trish's new relationships and frequent moves have, to some extent, frustrated his ability to do so. *See Stephens*, 2014 WL 3511904, at *3. While the record shows Jesse has missed a few of J.B.'s parent-teacher conferences and sporting events since she started school, by all accounts, he has been a loving father and capable parent as evidenced by the parties' past joint-physical-care arrangement.

According to Trish, the district court gave undue emphasis to that informal arrangement she and Jesse maintained up until the August 2018 ruling. She asserts the "voluntary shared care plan that existed prior to J.B. reaching school age is inconsistent with the primary care Trish provided in the nearly three years since the decree." But again, we find this distinction unconvincing because it was only after Trish moved to Minnesota that joint physical care became unworkable and she was granted physical care. In other words, we cannot fault Jesse for not being as actively involved in J.B.'s day-to-day routine and care when he had limited visitation because of Trish's move to Minnesota.

In sum, we agree with Trish that her history as J.B.'s primary caretaker is a factor to be considered. But we disagree with Trish's contention that "proximity of care should be the focal concern, which is keeping J.B. in her current care plan." *See Hansen*, 733 N.W.2d at 697 (declining to give controlling weight to approximation factor because "our case law requires a multi-factored test where no one criterion is determinative"). So we turn to other key factors: the parents' ability to communicate and show mutual respect, the degree of conflict between

them, and the degree to which they generally agree about their approach to daily matters. *Id.* at 698–99.

To start, Trish does not dispute the district court's finding that she and Jesse "have displayed the ability to communicate, respect, and trust each other when it comes to the care of their child." Nor does she dispute that little conflict exists between them. Still, she states that "[w]hile she has maintained civility, the court failed and erred to weigh against Jesse his continued demeaning attacks on [her] character," such as calling her "unstable."

In response to this argument, Jesse explains in his brief that any reference to Trish's instability was not an accusation that "she was an unfit person or mentally unstable," but rather a statement made in direct reference to the considerations of stability, continuity, and approximation in the joint-physical-care analysis. This explanation is consistent with the district court's determination that there is no evidence of "any significant conflict between Trish and Jesse that would impact their ability to again successfully exercise joint physical care over J.B." Plus, the court found that both credibly testified they were able to communicate civilly with each other without hostility or resentment. *See In re Marriage of Walton*, 577 N.W.2d 869, 871 (Iowa Ct. App. 1998) (deferring to district court's credibility findings). We see nothing in the record that suggests the parties are incapable of co-parenting. In fact, they did so effectively until J.B. reached school age in Minnesota, at which time both Trish and Jesse agreed an alternating-week care schedule was no longer feasible. Accordingly, these factors weigh in favor of joint physical care.

As for the fourth factor—how much the parents generally agree on daily matters of child care—we agree with the district court that, despite some differences in parenting styles, Trish and Jesse appear to be on the same page when it comes to J.B.'s medical care, extracurricular activities, and education. Trish's main complaint is that Jesse has not consistently participated in those matters in the past, indicating that "he cannot maintain a routine consistent with [hers] and which is in J.B.'s best interests." We note her complaint is primarily based on circumstances that existed when the parties lived together, entitling it to less weight at this stage of the proceedings. After their separation and until Trish moved out of state, Jesse cared for J.B. fifty percent of the time without any problems. As the district court reflected, Trish testified to a single, isolated incident where J.B. was tardy to school because Jesse had overslept. But no parent is perfect. All things considered, we believe the parents are capable of resolving any differences in how they approach the child's routine care with good communication and mutual respect. That is the key. *See In re Marriage of Swenka*, 576 N.W.2d 615, 617 (Iowa Ct. App. 1998) ("If the parents of the children are able to cooperate and respect each other's parenting and lifestyles, a joint care arrangement can work.").

In addition to those four factors, Trish relies on the general principle that siblings, including half-siblings, should be kept together unless circumstances show that separation would better promote the child's long-range interests. *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986). Trish acknowledges that J.B. has half-siblings on both sides—A.W. on her side and O.B. on Jesse's side. But she argues J.B.'s relationship with A.W. should take precedence, given

their living situation. This argument holds little sway in the context of joint physical care where J.B. will still be able to spend half her time with A.W. *See Collett v. Vogt*, No. 14-0530, 2014 WL 5862144, at *4 (Iowa Ct. App. Nov. 13, 2014) (holding that "the child's interest in spending the maximum amount of time with both parents is not outweighed by the separation from the child's half-siblings during the time the child spends in [the other parent's] home"). While we do not minimize the importance of fostering the child's sibling relationships, we must prioritize the child's best interests, which requires us to provide "the opportunity for maximum continuous physical and emotional contact possible with both parents" so long as there is no risk of harm. Iowa Code § 598.1(1).

Based on the facts and circumstances presented here, we conclude the change from Trish's physical care to joint physical care was in J.B.'s best interests. This arrangement will allow J.B. to spend equal time with both parents as she has done before, especially now that distance and school districts are no longer concerns. For all the reasons detailed above, we affirm the district court's modification ruling.

**AFFIRMED.**