# IN THE COURT OF APPEALS OF IOWA

No. 21-0123
Filed April 13, 2022

**ANGELA LOUISE KASPAR,**
　　　　Plaintiff-Appellant,

**vs.**

**ANTHONY JOSHUA BIERMANN,**
　　　　Defendant-Appellee.
_____

　　　　Appeal from the Iowa District Court for Floyd County, DeDra Schroeder,

Judge.

　　　　A mother appeals a child custody decision awarding primary physical care

of her child to his father. **AFFIRMED.**

　　　　Judith O'Donohoe of Elwood, O'Donohoe, Braun, White, LLP, Charles City,

for appellant.

　　　　Megan Rosenberg, (until withdrawal), Hampton, and Richard S. Piscopo,

Jr. (until withdrawal) of Piscopo Law Firm, P.L.C., Mason City, for appellee.

　　　　Anthony Biermann, Mason City, self-represented appellee.

　　　　Considered by Bower, C.J., and Vaitheswaran and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Angela L. Kaspar appeals, challenging the physical care provisions of the decree entered December 31, 2020 regarding her child, C.K. The decree awarded primary physical care to the child's father, Anthony J. Biermann. Angela requests that she be awarded primary physical care, shared physical care, or increased visitation (in descending order of preference). Having reviewed the record, we agree with the district court's rendition of the facts and application of law. Accordingly, we affirm.

## I.  Background Facts and Proceedings.

Angela and Anthony have known each other since they were teenagers. Angela gave birth to their child, C.K., in early 2010. At the time, Anthony was subject to a no-contact order for domestic abuse committed against Angela. The one-year protective order expired in November 2010. The parties dispute when Anthony learned that he is C.K.'s father. At the latest, a paternity test conducted in 2013 confirmed this fact.

This court acknowledges that Angela has been, at various times, C.K.'s primary caretaker. However, her mother Cynthia stepped in as guardian for C.K. after requesting a child-in-need-of-assistance (CINA) finding in October 2012. At the time, Angela was dealing with her bipolar diagnosis and alcohol abuse. Angela was convicted of public intoxication in September 2012 and August 2013. C.K. was transitioned back to Angela's care in September 2014. Angela and C.K. moved to Waterloo at that time so that she could continue outpatient substance-abuse treatment at a facility there.

Anthony was largely absent from C.K.'s life until he was approximately eight years old. He was not able to step up after the DNA results were revealed during the CINA proceedings because, after pleading guilty to theft, Anthony was in jail and then a residential facility from February 2013 to March 2014. Anthony did receive approximately five furloughs from his stay in the treatment facility to visit C.K. during the period from 2013 to 2014. Anthony states that Angela made it clear that she did not want him involved with C.K. after those visits ended.

Anthony paid no child support until he was ordered to do so in 2017. Subsequently, Anthony began to be more involved, initially video chatting with C.K. and later meeting in person. In September 2018, Angela asked Anthony to take C.K. into his home to protect him from her then-paramour James Clemens. Angela acknowledged that C.K. witnessed domestic altercations between James and her and that James abused alcohol and drugs, including methamphetamine. Angela stated that although James was abusive, she was staying with him to protect the pair's daughter. Anthony's child support payments were terminated in February 2019 because C.K. had begun residing with him.

While C.K. was living with Anthony for approximately thirteen months, it is alleged that Anthony was a poor caretaker. He would lock himself in his room to play videogames and ignore C.K. He was lax in ensuring proper hygiene and failed to provide adequate food for C.K. At eight to nine years old, C.K. prepared some of his own meals, did his own laundry, and got himself ready for school. He was bullied at school for his poor hygiene, including foul-smelling clothes and sores on his head. Angela visited a number of times and expressed concern over the circumstances, but she took no immediate action to remove him from the situation.

Nor did any of Angela's other relatives who claim to have visited with C.K. during this time, including Angela's mother, grandmother, father, and brother.

Angela was hospitalized for her mental health twice in October 2019. Angela took C.K. back into her care in approximately November 2019. Shortly thereafter, she moved into the basement apartment of the same home where Anthony resided to live with another man, Trenton. She and C.K. resided with Trenton sporadically and also stayed with her mother and grandmother. C.K. expressed concern for the fighting that occurred between Trenton and Angela to his mental-health therapist. Trenton has a history of mental-health problems and used methamphetamine. Angela stated that she last used methamphetamine in December 2019. She and Trenton moved to a new home in the same town in April 2020. Trenton left the home in approximately October 2020.

Angela's last hospital commitment for mental health ended about four months prior to trial in August 2020. She had an operating-while-intoxicated (OWI) conviction in 2017 but claims to only drink alcohol socially now. The AA acquaintance who testified in support of Angela had believed she was completely sober over the last year. She has full legal custody of her only other child after James failed to appear for their custody hearing. Angela testified that she does not encourage nor discourage C.K.'s contact with Anthony. However, C.K. expressed to a DHS worker in March 2020 that he believed his mom had signed a paper so that his father could no longer communicate with him.

A CINA proceeding was initiated in early 2020 but dismissed without further action or removal. There were concerns over Angela's mental health and domestic violence by James, as well as a physical altercation between Anthony and

Angela's then-paramour Trenton. A safety plan was instituted that stipulated C.K. would not be exposed to domestic violence or substance abuse and that Angela would participate in drug testing.

Anthony has two other children with two other women. He pays no child support but visits each liberally. He was convicted of possession of marijuana in 2015 and claims to have last used the substance about one month prior to trial.

Angela filed a petition to establish visitation, child support, and medical support in January 2020. Trial was held in December 2020. Joint legal custody was awarded with primary physical care to Anthony. Angela was ordered to make monthly child support and medical support payments to Anthony. A visitation schedule was set forth in the event that the parties could not come to their own agreement. The schedule provided for Angela to have every other weekend, one overnight period each week, alternating holidays, and four nonconsecutive weeks of summer visitation with C.K. After the district court's decree, Anthony filed an application for order nunc pro tunc because Angela refused to turn the child over to Anthony. Under Angela's timely appeal, only the allocation of physical care is at issue.

## II. Review.

Our review of custody proceedings for a child born out of wedlock is de novo.[1] *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). We give weight to the

---

[1] The father failed to file a brief. "On the failure of the appellee to file a brief, the appellant is not entitled to a reversal as a matter of right, but the court may, within its discretion, handle the matter in a manner most consonant with justice and its own convenience." *Bowen v. Kaplan*, 237 N.W.2d 799, 801 (Iowa 1976) (citation omitted). Anthony's failure to file a brief does not alter our duty to conduct a de

district court's factual findings and credibility determinations, though we are not bound by them. *Id.*; Iowa R. App. P. 6.907. "Prior cases have little precedential value, except to provide a framework for analysis, and we must base our decision on the particular facts and circumstances before us." *In re Marriage of Will*, 489 N.W.2d 394, 397 (Iowa 1992).

### III. Analysis.

The governing factor in child custody determinations is the best interests of the child. Iowa R. App. P. 6.904(3)(o). The objective is placement in an "environment most likely to bring the children to healthy physical, mental and social maturity." *In re Marriage of Bartlett*, 427 N.W.2d 876, 877 (Iowa Ct. App. 1988) (citation omitted). Iowa Code section 598.41(3) (2020) sets forth a nonexclusive list of factors for consideration, which include the suitability of each parent as a custodian, the parents' ability to communicate, whether the psychological and emotional needs and development of the child will suffer from lack of contact and attention from both parents, the previous pattern of caregiving, each parent's support of the other, geographic proximity, and safety. As the district court noted, fairness to the parents is not an appropriate basis for resolution. *See In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). Rather, a physical care determination aims to place the child in the environment most likely to support the child's physical and mental health. *See id.*

Here, neither parent has established a particularly favorable case for their suitability as a custodian. The parents have continued to reside in relatively close

---

novo review. *See In re W.N.*, No. 15–0176, 2015 WL 6087624, at *2 n.3 (Iowa Ct. App. Oct. 14, 2015).

proximity to one another and rely on an extensive familial network for caregiving. Angela's aversion for communicating with Anthony was demonstrated by her hiding that she was taking C.K. back into her care in November 2019 by stating she was taking him out to dinner and simply never returning him to his father's home. She claims to want C.K. to have a positive relationship with his father but does not appear to have made good-faith efforts in this regard. *See In re Marriage of Will*, 489 N.W.2d at 399 (finding a parent's willingness to encourage contact with a noncustodial parent is a significant factor in determining custody). Anthony has allowed liberal visitation for Angela and her family members when C.K. was in his care. He has also managed working relationships with the mothers of his other children to establish an amenable visitation schedule without aid of the courts.

While there is not much more known about Anthony's other partners, Angela has not demonstrated positive relationships to C.K. at home. Her history of choosing partners leading to domestic and substance abuse has not offered C.K. the stable and safe home he deserves. The background of any adult with whom a parent seeks to establish a home becomes a significant factor in a custody dispute. *See In re Marriage of Decker*, 666 N.W.2d 175, 179 (Iowa Ct. App. 2003). As the district court noted, the companion will have an impact on the children's lives, and the type and manner of relationship the parent has sought to establish is an indication of the parent's priorities. *See id.*

Although Angela has been a primary caregiver throughout much of C.K.'s life, the general preference for continuity does not dictate that she remain the custodial parent. *See id.* at 178. "Insight for the determination of the child's long-range best interests can be gleaned from evidence of the parent's past

performance for that performance may be indicative of the quality of the future care that parent is capable of providing." *In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012). Here, the mother's track record is not favorable. While we applaud the progress Angela has made over the last year with several negative drug tests in connection with employment applications and treatment, we are not inclined to place C.K. primarily in such an inconsistent and volatile environment. Like the district court, we are under "no illusions that this is a long-term situation." She has battled substance abuse, mental-health issues, and poor domestic partnerships for many years. The district court found that she "presents as disingenuous and has a definite lack of insight into how her alcohol abuse, substance abuse, mental health, and poor choices in men has negatively impacted C.K." To the contrary, Anthony appeared "calm, straightforward, and honest," as well as "realistic as far as his shortcomings."

Having reviewed the record, we agree with the district court's disposition. Despite Anthony's lack of involvement throughout much of C.K.'s childhood and needing to step up his caretaking, Angela's substance issues and poor decision-making support awarding primary physical care to Anthony. *See In re Marriage of Harris*, 499 N.W.2d 329, 331–32 (Iowa Ct. App. 1993). Moreover, both parties affirmed at the conclusion of trial that they were requesting "all or nothing" in that each wanted primary, rather than shared, physical care. Because any request for shared physical care by either party was abandoned at trial, the law did not require the trial court to make specific findings relative to its failure to award it. At this time, Angela also requests increased visitation, specifically every other weekend in the summer rather than four nonconsecutive weeks. However, in light of the record

and overall placement, we decline to alter the schedule set forth by the district court.  Accordingly, we affirm the district court's physical care determination and visitation schedule.

**AFFIRMED.**