# IN THE COURT OF APPEALS OF IOWA

No. 15-2192
Filed October 26, 2016

**Upon the Petition of**
**CORY WANE FEES,**
        Petitioner-Appellee,

**And Concerning**
**AMANDA LEIGH COOK,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Mary Pat Gunderson,

Judge.


        Amanda Cook appeals the physical-care provisions of the district court's

order establishing custody, visitation, and support for her children with Cory

Fees. **AFFIRMED AS MODIFIED.**



        Alexandra D. Frazier of R.J. Hudson Law Firm, P.C., West Des Moines,

for appellant.

        Kodi A. Brotherson of Becker & Brotherson Law Offices, Sac City, and

Todd E. Babich of Babich Goldman, P.C., Des Moines, for appellee.



        Considered by Potterfield, P.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

Amanda Cook appeals the physical-care provisions of the district court's order establishing custody, visitation, and support for her two minor children with Cory Fees. Amanda contends she should have been granted physical care of the parties' minor children. She also argues the district court abused its discretion by admitting a journal Cory submitted that contained information regarding Amanda's attendance at her appointments with mental-health providers. Alternatively, she argues if we affirm the court's grant of physical care to Cory, the court incorrectly ordered her to split the costs of the children's extracurricular activities; Cory concedes this point. Cory requests an award of appellate attorney fees. Upon our de novo review of the record, we affirm as modified.

## I.     Background Facts and Proceedings

Amanda and Cory are the unmarried parents of two children: C.F. and K.F. At the time of trial, Cory was thirty-four years old, and Amanda was twenty-eight. Cory holds a bachelor's degree in electrical engineering. At the time of trial in November 2015, Cory had been employed as a senior controls engineer with the same company since 2012. Cory owns the home where he and Amanda lived with the children since late 2010. Amanda has a bachelor's degree in nursing. At the time of trial, she had been employed as a registered nurse in a pediatric intensive care unit since 2013.

Cory and Amanda met in July 2007. They dated off and on until December 2009, when Amanda learned she was pregnant with their first child. In February 2010, Cory introduced Amanda to his friends as a "friend" rather than

his girlfriend. Amanda became upset and refused to communicate with Cory for several months.

After the parties reconciled in May 2010, Cory attended birthing classes with Amanda as well as her prenatal medical appointments. Cory was present for C.F.'s birth in July 2010. After C.F.'s birth, Amanda and C.F. lived with Amanda's parents. Soon after her release from the hospital, Amanda developed complications and was admitted to the hospital for surgery. Cory took two weeks off of work to care for C.F. with assistance from Amanda's parents. After Amanda recovered, she and Cory shared in the responsibilities of caring for C.F. and transporting him to daycare with the help of both parties' parents. At the time, Amanda was attending nursing school full time and working at a grocery store. Cory continued to provide care for C.F. in the evenings after he returned to work and often stayed at Amanda's parents' home to assist in providing overnight care for C.F. until Amanda and C.F. moved into his home in December 2010.

In May 2011, Amanda obtained employment as a registered nurse. She had a sporadic schedule, working twelve-hour shifts that often extended past her scheduled shift end, rotating days and nights, and working every third weekend. Amanda also often picked up extra shifts. The parties kept track of her random schedule by entering the days she worked into a shared online calendar. Amanda cared for C.F. on the days she was not working, and Cory provided care for C.F. in the early mornings, evenings, and on weekends. In November 2012, Cory obtained new employment and began providing most of the transportation to and from daycare.

In February 2013, the parties learned they were pregnant with their second child. That same month, Cory proposed marriage to Amanda. In April, Cory started keeping an online journal describing incidents in which Amanda threatened to take the children away from him.[1] In September, the parties' second child, K.F., was born. Cory attended all prenatal appointments for K.F. and again took time off from work to care for the new baby with Amanda.

Cory and Amanda's relationship started to deteriorate soon after. In early 2014, the parties split, and Amanda moved back in with her parents. The parties shared parenting time with the children and agreed to attend couples counseling. Amanda also started attending individual counseling. Eventually, the parties reconciled and Amanda moved back in with Cory; however, their relationship continued to decline. Disagreements between the parties would often end with Amanda putting the children in the car and driving away, threatening Cory he would never see their children again.

In late November 2014, the parties had a disagreement that again resulted in Amanda moving out of Cory's home. On December 4, Cory filed a petition for custody, visitation, and child support. On December 16, Amanda served Cory with a temporary no-contact order, prohibiting contact between the parties and between Cory and the children.[2] On December 31, the parties agreed to the

---

[1] The journal also contained information regarding Amanda's scheduled appointments with mental-health providers, the parties' scheduled couples counseling sessions, when and where the children stayed overnight or traveled, descriptions of incidents that occurred between the parties, and a schedule of various court dates set for the paternity action.

[2] The temporary no-contact order was in place for twenty-one days. Cory testified at trial he saw the children once during that time on December 26 to celebrate the holiday.

entry of a protective order by consent. The district court did not expressly find that either party had committed a domestic abuse assault.[3]

On February 16, 2015, the district court entered a temporary custody order granting joint legal custody and joint physical care and incorporating the no-contact order.[4] The parties continued to struggle with communication issues regarding the children and their activities. The matter came on for trial on November 17–19, 2015.

Cory testified that throughout the parties' relationship he was responsible for maintaining the home, including preparing meals for the children; cleaning; and doing laundry, yard work, and other household tasks. He testified he also paid the couple's shared bills, except the daycare expenses, for which Amanda agreed to pay.[5] Cory testified he had a stable home in a good neighborhood and a job that allowed him flexibility to care for the children. He also testified he did not believe Amanda would support his relationship with their children.

---

[3] At trial, Amanda testified Cory had verbally and physically abused her on several occasions. She testified Cory shut doors on her, pushed her into walls, dragged her across the room by her arm, yelled and screamed at her, and called her names. Cory denied Amanda's allegations. Cory testified Amanda slapped him on the face on two separate occasions; Amanda denied she slapped Cory on one occasion but admitted she slapped Cory during a second incident.

Cory testified at trial he consented to the protective order because he believed it was a mutual no-contact order that would provide him relief as well and include a schedule allowing him visitation time with the children. He testified that, otherwise, he was not guaranteed to see the children until late the next month, when a hearing on the temporary no-contact order was scheduled. Cory testified he obtained new counsel as a result of him being misinformed of the consequences of the entry of the protective order by consent.

[4] On March 24, 2015, the court entered an order dismissing the previous no-contact order.

[5] Following entry of the temporary custody order in February 2015, the parties split the children's daycare expenses.

Amanda testified she was the primary caregiver for the children. She testified she was in charge of coordinating schedules and figuring out who was picking up the children from daycare. She also testified she was in charge of making the children's medical appointments and taking them to well- and sick-child appointments; however, she also acknowledged Cory attended the children's well-child checkups and specialty doctor appointments. At the time of trial, Amanda had switched her schedule at the hospital to only overnight shifts and shifts on every other weekend in order to maximize her time spent with the children.

The children's daycare provider volunteered to serve as the intermediary for the parties' physical care exchanges. Both parties testified they were satisfied with the provider's care of their children and believed she provided high-quality care for them. The provider testified at trial Cory was "a great dad," who always put the children first and tried to make the exchanges easy for them. In contrast, she testified Amanda sought confrontation with Cory, showing up late to the exchanges, dragging out her goodbyes with the children, and making inappropriate comments about Cory to the children, including "Your daddy has you dressed inappropriately," "Daddy was wrong. We are going to the police station now. He is in violation of the order," and "I see your daddy has you dressed in the same filthy clothes I brought you in." She also testified Amanda became upset if she thought Cory parked too close to the provider's house and once yelled to the provider with the children in the car to "tell him to get the hell out of here before I drop these kids off." She further testified Amanda often yelled in front of the children and would leave the exchanges upset, saying she

was going to contact her lawyer. The provider described this type of behavior as typical for Amanda if Cory was present when she was picking up or dropping the children off at daycare.

Cory's neighbor also testified at trial. She testified she heard Amanda yelling at Cory and the children so frequently it became an uncomfortable joke among her family members and the neighbors. She described observing Cory playing with the children outdoors and calmly providing them with redirection when necessary.

In an oral ruling from the bench, the district court noted both parents clearly loved their children but neither demonstrated the high level of maturity or ability to communicate to be able to focus on the best interests of the children and share physical care. The court also noted it was dismayed by the hostility the parties had exhibited toward each other in front of the children.

The court weighed the credibility of both parties' witnesses and found Cory's neighbor and the children's daycare provider to be particularly credible and compelling. The court also noted several witnesses had "testified and described a pattern of behavior between Cory and Amanda." The court found "[d]uring any kind of conflict Amanda would escalate and ultimately threaten Cory that he would never see his children again. She would then frequently take the children from the home and withhold contact from Cory." The court described two specific incidents demonstrating this type of behavior by Amanda. One incident involved a disagreement between the parties that escalated until Amanda took the children upstairs and shut herself and the children into a closet and refused to let the children out until her mother and brother arrived and were

able to eventually coax her out. Another incident occurred when Amanda moved out for the final time. Amanda brought the two children to Cory's home but insisted they remain in their car seats in her vehicle over a period of at least two hours while she and her parents removed her belongings.[6] The children witnessed Amanda screaming profanities at Cory and his family and threatening they would never see the children again. Cory's parents eventually called the police to supervise the move. The court also noted that throughout the trial Amanda exhibited histrionic behavior by audibly whispering or writing furiously to her attorney, while Cory remained calm throughout the proceeding.

The court also acknowledged Amanda's desire to move to Kansas City with the children to be closer to her family and was concerned about the increased instability such a move would bring to the children's lives.

The district court awarded the parties joint legal custody of their children and granted physical care of the children to Cory and reasonable and liberal visitation to Amanda, including parenting time every Thursday afternoon until Friday morning and alternating weekends from Friday afternoon until Monday morning. The court also ordered the parties to split the expenses for the children's future extracurricular activities, with Cory being responsible for fifty-eight percent and Amanda being responsible for forty-two percent of these costs.

---

[6] Prior to Amanda moving out, the parties, along with their respective parents, gathered at Amanda's parents' home to discuss the parties' relationship and the best interests of the children, including a shared parenting time schedule. All involved decided it was best for Cory and Amanda to end their relationship. They scheduled a date for Amanda to move out of Cory's home and arranged for Cory's sister to care for the children during that time; however, on the scheduled move-out date, Amanda refused to allow the children to leave with Cory's sister.

On December 9, 2015, the district court entered a written ruling memorializing the court's oral custody, visitation, and child-support order. Amanda appeals.

## II. Analysis

### A. Physical Care

We employ the same legal analysis in resolving questions concerning the custody of a child born to unmarried parents as we do in the case of divorcing parents. *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). Issues ancillary to a determination of paternity, such as custody, visitation, and child support, are reviewed de novo. *See Markey v. Carney*, 705 N.W.2d 13, 19 (Iowa 2005); *see also* Iowa R. App. P. 6.907. Although we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend upon the facts of the particular case." *In re Marriage of Fennelly,* 737 N.W.2d 97, 100 (Iowa 2007) (citation omitted).

When physical care is at issue in a paternity action, the primary consideration is the best interests of the children. Iowa R. App. P. 6.904(3)(o). We look to the factors listed in Iowa Code section 598.41(3) (2013),[7] *see* Iowa

---

[7] Iowa Code section 598.41(3) provides "the court shall consider the following factors" in making a physical-care determination:
  a. Whether each parent would be a suitable custodian for the child.
  b. Whether the psychological and emotional needs and development of the child will suffer due to lack of active contact with and attention from both parents.
  c. Whether the parents can communicate with each other regarding the child's needs.
  d. Whether both parents have actively cared for the child before and since the separation.

Code § 600B.40, and *In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974),[8] in making a physical-care determination. Also relevant to this decision are the factors of continuity, stability, communication, and approximation. *See In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Not all factors are

---

> e. Whether each parent can support the other parent's relationship with the child.
>
> f. Whether the custody arrangement is in accord with the child's wishes or whether the child has strong opposition, taking into consideration the child's age and maturity.
>
> g. Whether one or both the parents agree or are opposed to joint custody.
>
> h. The geographic proximity of the parents.
>
> i. Whether the safety of the child, other children, or other parent will be jeopardized by the awarding of joint custody or by unsupervised or unrestricted visitation.
>
> j. Whether a history of domestic violence, as defined in section 236.2, exists. . . .
>
> k. Whether a parent has allowed a person custody or control of, or unsupervised access to a child after knowing the person is required to register or is on the sex offender registry as a sex offender under chapter 692A.

[8] Additional factors the court should consider include:

> (1) The characteristics of each child, including age, maturity, mental and physical health.
>
> (2) The emotional, social, moral, material, and educational needs of the child.
>
> (3) The characteristics of each parent, including age, character, stability, mental and physical health.
>
> (4) The capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child.
>
> (5) The interpersonal relationship between the child and each parent.
>
> (6) The interpersonal relationship between the child and its siblings.
>
> (7) The effect on the child of continuing or disrupting an existing custodial status.
>
> (8) The nature of each proposed environment, including its stability or wholesomeness.
>
> (9) The preference of the child, if the child is of sufficient age and maturity.
>
> (10) The report and recommendation of the attorney for the child or other independent investigator.
>
> (11) Available alternatives.
>
> (12) Any other relevant matter the evidence in a particular case may disclose.

*In re Marriage of Winter*, 223 N.W.2d at 166–67.

given equal consideration, and the weight attributed to each factor depends on the specific facts and circumstances of each case. *See In re Marriage of Williams*, 589 N.W.2d 759, 761 (Iowa Ct. App. 1998). Our objective is to place the children in an environment likely to promote a healthy physical, mental, and social maturity. *Hansen*, 733 N.W.2d at 695.

Amanda claims the district court improperly weighed various factors in determining which party should have physical care of the children. Our review of the record shows both parties actively cared for the children before and after their relationship ended. On our de novo review, we find no reason not to give deference to the district court's credibility determinations and its decision to give greater weight to the testimony of the children's daycare provider and Cory's neighbor rather than either of the party's family members or close friends. *See* Iowa R. App. P. 6.904(3)(g). Furthermore, in both its oral and written ruling, the district court noted both parties had exhibited hostility toward one another but ultimately concluded Cory had shown he was better able to support Amanda's relationship with their children.

Amanda also contends the district court failed to consider issues of domestic abuse in making its physical-care determination.[9] The record shows Amanda has failed to present any evidence other than her own testimony to show a "history of domestic abuse." *See* Iowa Code § 598.41(3)(j); *see also In re Marriage of Forbes*, 570 N.W.2d 757, 759–60 (Iowa 1997) (holding "a 'history' is

---

[9] The court failed to address Amanda's allegations of domestic abuse in either its oral or written rulings. Amanda did not file a motion pursuant to Iowa Rule of Civil Procedure 1.904(2) asking the court to enlarge or amend its findings of fact and conclusions of law. Due to the serious nature of this factual issue, on our de novo review we nevertheless address the merits of Amanda's claim.

not necessarily established by a single documented incident . . . [n]or does more than one minor incident automatically establish a 'history of domestic abuse.'"). Amanda failed to produce any documented evidence of even a single incident of domestic abuse perpetrated against her by Cory other than the protective order the parties entered into by consent, in which the court did not find Cory had committed a domestic abuse assault against Amanda. At trial, Cory denied Amanda's allegations of domestic abuse. He testified he consented to the protective order because he believed it would be mutual and provide a specified visitation schedule that would enable him to see the children. In contrast, Amanda admitted she slapped Cory during a disagreement with him. Further, several witnesses testified they had observed Amanda yelling at both Cory and the children on numerous occasions. Thus, we do not find this factor weighs in favor of placing the children in Amanda's physical care.

Upon our de novo review of the record, we find no reason to disagree with the district court's decision to award physical care of the parties' children to Cory. We believe placement of the children in Cory's care is in their best interests.

> *B.   Cory's Journal*

We generally review evidentiary rulings for an abuse of discretion. *See Gamerdinger v. Schaefer*, 603 N.W.2d 590, 594 (Iowa 1999). In doing so, we give wide latitude to the district court in ruling on the admissibility of evidence. *Kalvik ex rel. Kalvik v. Seidl*, 595 N.W.2d 136, 140 (Iowa Ct. App. 1999). We refrain from disturbing the district court's evidentiary rulings "unless there is a clear and prejudicial abuse of discretion." *Carter v. Wiese Corp.*, 360 N.W.2d 122, 130–31 (Iowa Ct. App. 1984) (citation omitted). We review the questions of

statutory interpretation for correction of errors at law. *See Ashenfelter v. Mulligan*, 792 N.W.2d 665, 668–69 (Iowa 2010).

Amanda contends the district court should have excluded Cory's journal because the journal (1) contained privileged information, (2) was unnecessarily duplicative and cumulative when viewed in combination with Cory's testimony, (3) contained inadmissible hearsay, and (4) contained inadmissible offers of compromise or communications in an effort to resolve these proceedings out of court.

Amanda claims the references Cory made in the journal regarding her seeking mental-health therapy and the parties' couples counseling are confidential and privileged information under Iowa Code section 622.10 because they constitute medical records. We have reviewed the admitted exhibit and determine the journal does not contain any mental-health or medical-professional records or privileged communications; rather it contains Cory's personal knowledge of appointments Amanda had scheduled with various mental-health providers. *See* Iowa Code § 622.10(1) (providing a "mental health professional . . . shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional capacity"); *id.* § 622.10(6)(e)(1) (defining medical records as "containing a patient's health or billing information"); *see also McMaster v. Iowa Bd. of Psychology Exam'rs*, 509 N.W.2d 754, 757 (Iowa 1993) ("The privilege in section 622.10 is limited to disclosure of confidential communications *by the giving of testimony*.").

Furthermore, we do not find the journal is needlessly cumulative when viewed in combination with Cory's testimony such that its admission unfairly prejudiced Amanda. *See* Iowa R. Evid. 5.403. We also do not find the information contained within the journal served to harass or unduly embarrass Amanda. *See* Iowa R. Evid. 5.611(a). Additionally, Amanda has failed to show the district court relied on any alleged inadmissible part of the exhibit in making its physical-care determination; thus we find no error in admitting it.

Accordingly, we conclude the district did not abuse its discretion in admitting Cory's journal.

### C. Extracurricular Expenses

Cory concedes the district court should not have ordered Amanda to pay a portion of the children's extracurricular activities expenses because he has physical care of the children. We agree. *See* Iowa Ct. R. 9.11. Because we affirm the district court's grant of physical care of the children to Cory, we modify the district court's order as to this issue.

### D. Appellate Attorney Fees

Cory requests appellate attorney fees. In a paternity action, "the court may award the prevailing party reasonable attorney fees." Iowa Code § 600B.26. An award of appellate attorney fees rests within this court's sole discretion. *Markey*, 705 N.W.2d at 26. In determining whether to award attorney fees, we consider "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the trial court's decision on appeal." *Id.* (citation omitted). Having considered these

factors, we determine Amanda shall pay $3000 of Cory's appellate attorney fees. Costs shall be assessed eighty percent to Amanda and twenty percent to Cory.

### III.     Conclusion

Upon our de novo review of the record, we affirm the district court's grant of physical care of the parties' two minor children to Cory. We find the court did not abuse its discretion in admitting Cory's journal. Cory concedes the court should not have ordered Amanda to pay a portion of the children's extracurricular activities expenses because Cory has physical care of the children; thus we modify the court's decision as to this issue. We award Cory $3000 in appellate attorney fees. Costs shall be assessed eighty percent to Amanda and twenty percent to Cory.

**AFFIRMED AS MODIFIED.**