# IN THE COURT OF APPEALS OF IOWA

No. 16-1452
Filed June 7, 2017

**JUSTIN DEMOND HYDE,**
        Petitioner-Appellant,

**vs.**

**ONTARIA MONIQUA MANN,**
        Respondent-Appellee.

_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal,

Judge.


A father appeals the district court's grant of physical care of his minor child

to the child's mother. **AFFIRMED**.


Matthew G. Sease of Kemp & Sease, Des Moines, for appellant.

Jason S. Rieper of Rieper Law, P.C., Des Moines, for appellee.


Heard by Vogel, P.J. and Doyle and McDonald, JJ.

**MCDONALD, Judge.**

Justin Hyde, Sr., (Justin) and Ontaria Mann (Ontaria) are the never-married parents of J.D.H.J.  In the fall of 2015, Justin filed a petition to establish paternity, custody, visitation, and support.  Justin sought physical care of J.D.H.J.  The district court granted the parties joint legal custody of J.D.H.J. and awarded Ontaria physical care of the child.  Justin timely filed this appeal.

I.

Justin and Ontaria met in 2008 and moved in together in 2009.  The relationship was not healthy.  The couple separated shortly after Ontaria became pregnant.  After the parties separated, Justin moved back to his hometown, Dallas, Texas.  Justin returned to Iowa for Ontaria's scheduled delivery.  Ontaria gave birth to J.D.H.J. in March 2010.  Justin remained with Ontaria and J.D.H.J. for several days after birth and then returned to Texas.  Over the next year, Justin returned to Iowa several times to visit with J.D.H.J.  Justin testified he and Ontaria exercised shared physical care of the child in three-month intervals starting around the time of the child's first birthday.  The record does not support this claim.  Instead, it appears Justin exercised extraordinary visitation with the child prior to the time the child started school.  After J.D.H.J. began school, J.D.H.J. spent the school year with Ontaria and summer and holiday breaks with Justin.

At the time of trial, Ontaria was employed in the Hy-Vee pharmacy department.  She commenced that employment shortly after Justin filed this action.  Before obtaining employment at Hy-Vee, Ontaria worked as an exotic dancer and attempted to start a catering business.  Prior to her employment with

Hy-Vee, her earnings history is unknown. She did not provide any documentation or testimony regarding her income. Nor did she file any tax returns. She testified she did not file tax returns because of her embarrassment about her past profession. It appears from the record she received public assistance in the form of housing and food stamps. At the time of trial, Ontaria had a suspended license. She testified she continued to drive, however—sometimes with J.D.H.J. in the car.

At the time of trial, Ontaria resided in a single-family home on the south side of Des Moines. It appears Ontaria was living in public housing until after the time Justin filed this action. At her new residence, J.D.H.J. has his own room and a yard to play in. Ontaria's sister lives nearby and helps care for J.D.H.J. when Ontaria is at work. J.D.H.J. often plays with Ontaria's sister's children. Ontaria's sister-in-law also lives in the area and helps Ontaria by providing her with a car and assisting with care for J.D.H.J. Ontaria's mother has an active role in J.D.H.J.'s daily life. She usually picks him up from school and watches him until Ontaria returns home from work. J.D.H.J. regularly attends church with his family. Ontaria also has an older daughter, who spends the majority of her time in Burlington with her father.

Justin recently went to school to get his x-ray technician's license and, at the time of trial, worked as a limited x-ray technician. Previously, Justin worked odd jobs and welded for his grandfather. In 2013, Justin was ordered to pay child support. As of trial, he had paid $894 in support out of the $4472 due.

Justin has criminal history. In 2004, Justin pleaded guilty to assault causing injury after getting into a fight. Justin was placed on probation, which he

violated. In 2011 or 2012, Justin was arrested and charged with several drug trafficking offenses, including distribution of cocaine and marijuana. In 2015, to resolve the charges, Justin pleaded guilty to attempted possession of a controlled substance. He admitted he bought and sold prescription medications, including cancer medications he stole from his maternal aunt. He was placed on probation, which he violated on several occasions when he tested positive for marijuana. As a result, Justin was jailed for six days. At the time he was jailed, J.D.H.J. was in his physical care. While in jail on his probation violation, Justin got into an altercation with a detention officer and threatened to kill him. Also, while still detained on his probation violation, Justin became upset and broke a sprinkler head off of the fire suppression system and flooded the jail. He was charged with and pleaded guilty to criminal offenses arising out of these two incidents.

Justin lives with his fiancée in a single family home in the Dallas area. Justin has another son from a prior relationship who is in his physical care. J.D.H.J. tries to emulate his half-brother, who is three years older. Justin's parents and grandparents also take an active role in J.D.H.J.'s life and provide care for J.D.H.J. At times, Justin's parents even transported J.D.H.J. between Iowa and Texas. While in Texas, J.D.H.J. participates in the Boys and Girls Club and attends church and bible study.

The parents agree J.D.H.J. is generally a well-mannered and thriving child. He has some minor health problems, including allergies and asthma. J.D.H.J. uses an inhaler, as needed, and a breathing machine daily. At the time

of trial, J.D.H.J. was ready to start first grade in Des Moines. J.D.H.J. previously attended preschool and kindergarten in the Des Moines Public School District.

In the fall of 2015, Ontaria had a disagreement with her then-paramour. The paramour accused Ontaria of domestic assault. Ontaria claims J.D.H.J. told her that her paramour inappropriately touched him during bath time. Ontaria admits she "ran with it" and accused her paramour of sexually abusing J.D.H.J. While she never testified that she fabricated the story or coached J.D.H.J., she does admit that she was mistaken and no abuse took place. As a result of the accusation, the Iowa Department of Human Services (IDHS) investigated the sexual abuse claims. A summary of IDHS's investigation notes there was no criminal investigation into the sexual abuse allegation because Ontaria admitted to police that she made the allegation up. During the IDHS investigation, J.D.H.J. was tardy or absent seventeen times in one month of school. Eventually the IDHS investigation determined the accusation of sexual abuse was unfounded but concluded that Ontaria endangered J.D.H.J. by denying critical care, stemming from her abusive relationship with her paramour. IDHS directed Ontaria to take certain steps to improve her care for J.D.H.J. Ontaria complied by seeking therapy and breaking up with her paramour.

Upon learning of the investigation, Justin traveled to Iowa to take custody of J.D.H.J. and initiated this action. Justin filed a petition for emergency temporary physical care of J.D.H.J. The district court granted Justin temporary physical care, determining that Justin was "barely" in a better position than Ontaria to care for J.D.H.J. In the temporary order, Ontaria was granted at least four overnight visits per month and liberal access to J.D.H.J. by telephone. After

Ontaria had difficulty contacting J.D.H.J. by phone, she filed a motion to return physical care to her. Justin and his counsel failed to appear at the hearing, and the district court returned physical care to Ontaria.

At trial, both parties sought physical care of the child. The district court determined Ontaria is better situated to retain physical care, with Justin exercising visitation during the summer, winter break, and spring break. Justin then filed a motion to enlarge and a motion for reconsideration; the court denied both. Justin timely filed this appeal.

## II.

Child custody proceedings are reviewed de novo. *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). "We give weight to the findings of the district court, especially to the extent credibility determinations are involved." *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007) (citing *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006)). "Prior cases have little precedential value; we must base our decision primarily on the particular circumstances of the parties in this case." *In re Marriage of Weidner*, 338 N.W.2d 351, 356 (Iowa 1983) (citing *In re Marriage of Kehrli*, 241 N.W.2d 923, 926 (Iowa 1976)). Our determination of physical care does not change because the parties were never married. *See Lambert*, 418 N.W.2d at 42.

## III.

Our determination of physical care must turn on what is in the best interests of J.D.H.J. *See In re Marriage of Junkins*, 240 N.W.2d 667, 668 (Iowa 1976). "In determining the visitation or custody arrangements of a child born out of wedlock, if a judgment of paternity is entered and the mother of the child has

not been awarded sole custody, section 598.41 shall apply to the determination, as applicable, and the court shall consider the factors specified in section 598.41, subsection 3, including but not limited to the factor related to a parent's history of domestic abuse." Iowa Code § 600B.40. Iowa Code section 598.41(3) (2015) provides a nonexclusive list of factors to consider when determining what care arrangement is in a child's best interests. *See Hansen*, 733 N.W.2d at 696. Factors most relevant to this proceeding include: J.D.H.J.'s age, maturity, mental and physical health; his emotional and educational needs; Ontaria and Justin's character, stability, and mental health; and their ability to meet J.D.H.J.'s emotional and educational needs. *See In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974). We must also give considerable weight to continuity, stability, and approximation of care, while being mindful of "situations where the emotional bonds between children and a parent who has not been the primary caregiver are stronger than the bonds with the other parent." *Hansen*, 733 N.W.2d at 700. Only a parent that supports the child's relationship with the other parent may be selected as primary caregiver to the child. *Id.*

When we examine the ledger, we find both parents have their debits. Justin has criminal history, including a history of violence and distribution of controlled substances. Justin has a history of substance abuse, as reflected in his positive drug tests during his most recent probation. Justin has not always provided appropriate care for and support of J.D.H.J. Justin left Iowa shortly after Ontaria became pregnant. Justin failed to provide meaningful financial support for the child. He is currently delinquent on his child support obligation. Justin has limited knowledge of J.D.H.J.'s educational history. Justin has limited

knowledge of J.D.H.J.'s medical needs. He disputes J.D.H.J.'s asthmatic condition, claiming J.D.H.J.'s symptoms are a result of second-hand smoke and exposure to black mold, even though J.D.H.J.'s medical records indicate a medical doctor diagnosed him with chronic asthma.

Ontaria has exercised poor judgment and demonstrated a propensity for dishonesty. Most glaringly, she involved J.D.H.J. in a frivolous complaint of sexual abuse as a means to seek revenge on her then-paramour. At trial, Ontaria conceded "I had spoken to my son and he alleged something and at the time I took it and ran with it and it wasn't completely true and that's what happened." She exercised extremely poor judgment in making a false claim. She does not have a valid driver's license but continues to drive, exposing herself to criminal sanction. She failed to report her income for years while at the same time receiving public assistance. She exposed her son to domestic violence in the home, resulting in a founded complaint of denial of critical care.

The ledger also shows the parents have credits. Justin testified he no longer uses controlled substances. He completed court-ordered anger-management training. Justin sought out vocational training, is now a licensed x-ray technician, and has steady employment. His relationship with his fiancée appears to have had a positive impact on Justin, and his fiancée reported no abuse in their relationship. When J.D.H.J. is in Dallas, Justin involves him in the local Boys and Girls Club and takes him to church and to bible study. Justin's extended family, including his parents and grandparents, appear kind, thoughtful, and loving. In addition, J.D.H.J. is able to spend time and bond with his half-brother while in Justin's care.

Ontaria, in light of the IDHS's findings, sought out therapy to address her emotional issues and ended her relationship with her abusive paramour. Since the conclusion of the IDHS investigation, J.D.H.J. has had no school attendance issues. Ontaria recently commenced employment at a pharmacy and is training to become a pharmacy technician. Her new position provides steady hours and benefits, including a 401(k) program and health insurance. Her family continues to play an active and positive role in J.D.H.J.'s upbringing. Ontaria's mother and sister provide care and transportation to J.D.H.J. while Ontaria works. J.D.H.J. also has a strong bond with his maternal cousins and the family regularly attends church together creating a connection between J.D.H.J. and the local community.

"Determining what custodial arrangement will best serve the long-range interest of a child frequently becomes a matter of choosing the least detrimental available alternative for safeguarding the child's growth and development." *Winter*, 223 N.W.2d at 167. Both Justin and Ontaria have faced challenges impeding their ability to effectively parent, but both appear to be improving their lives to become better parents. Considering the factors enumerated in Iowa Code section 589.41(3) and *In re Marriage of Hansen*, it is in J.D.H.J.'s best interests for Ontaria to retain physical care of J.D.H.J.

Maintaining continuity of care for J.D.H.J. is of particular importance in the present case. *See Hansen*, 733 N.W.2d at 696–97. Justin's family and fiancée testified to the emotional strain placed on J.D.H.J. each time he is transferred from one parent's care to the other's care. They indicated J.D.H.J. becomes emotionally upset and acts out after each exchange. They said J.D.H.J. even talked about self-harm and harming others after one exchange. This emotional

stressor should be minimized to prevent any unnecessary emotional distress for J.D.H.J. *See id.* at 697 (indicating a change in care arrangement can emotionally harm a child and is not in the child's best interests). Ontaria has been J.D.H.J.'s primary caregiver for most of his life. She has shouldered the burden of parenting duties for J.D.H.J., including: securing medical coverage and care for J.D.H.J.; enrolling J.D.H.J. in school and establishing relationships with educators; arranging for after-school childcare; and providing food, shelter, and clothing for J.D.H.J. *See id.* (giving considerable weight to parties' past level of involvement and assumption of caregiving duties).

In addition, Ontaria's support of J.D.H.J.'s relationship with Justin has remained steadfast. She testified credibly regarding the importance she placed on maintaining the bond between J.D.H.J. and his father. This augurs in her favor. *See id.* at 700. In contrast, when Justin was awarded temporary physical care of J.D.H.J., he impeded contact between J.D.H.J. and Ontaria.

While J.D.H.J.'s relationship with his half-brother should be considered when determining J.D.H.J.'s best interests, the relationship is not dispositive. *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986). Generally siblings should not be separated, including half-siblings. *Id.* However, simply because one parent has physical care of a half-sibling does not mean the parent must have physical care of the child at issue. *See In re Marriage of Brauer*, 511 N.W.2d 645, 647 (Iowa Ct. App. 1993). While it is important to keep siblings together, ultimately the child's long-term best interests are the paramount consideration. *Id.* Removing J.D.H.J. from Ontaria's physical care and placing him into Justin's, for the sake of putting together half-siblings who have not

previously lived together on a continuous basis, is not in J.D.H.J.'s long-term best interests. *See id.* (determining it was not in a child's best interests to remove her from her primary caregiver so she may live with a half-sibling).

Our determination that Ontaria should retain physical care does not mean Justin is a poor caregiver, it only means it is in J.D.H.J.'s best interests to remain in Ontaria's care. Both parents should continue on their paths of self-improvement, for J.D.H.J.'s sake as well as their own, and work on effectively communicating with each other.

IV.

Ontaria requests appellate attorney fees. Iowa Code section 600B.26 permits the award of reasonable attorney fees in proceedings to determine custody. "An award of appellate attorney fees is within the discretion of the appellate court." *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005) (citing *In re Marriage of Ask*, 551 N.W.2d 643, 646 (Iowa 1996)). When determining if appellate attorney fees should be awarded the court considers "the needs of the party making the request, the ability of the other party to pay, and whether the party making the request is obligated to defend the trial court's decision on appeal." *Id.* (quoting *Ask*, 551 N.W.2d at 646). Because this action was initiated, in large part, by Justin's rightful concern for the welfare of J.D.H.J. after Ontaria falsely reported J.D.H.J. was being sexually abused by her paramour, we decline Ontaria's request for legal fees.

V.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**