# IN THE COURT OF APPEALS OF IOWA

No. 19-2031
Filed September 2, 2020

**ANDREW LEE LESHER,**
     Petitioner-Appellee/Cross-Appellant,

**vs.**

**TAYLOR NOELLE HANSEN,**
     Respondent-Appellant/Cross-Appellee.
_____

     Appeal from the Iowa District Court for Wright County, Colleen D. Weiland,

Judge.


     The mother appeals the physical-care provisions of the custody decree; the

father cross-appeals, seeking a change in the child's surname. **AFFIRMED ON**

**BOTH APPEALS.**


     Marcy Lundberg of Cordell Law, LLP, Des Moines, for appellant.

     Jamie Hunter of Dickey & Campbell Law Firm, PLC, Des Moines, for

appellee.


     Considered by Tabor, P.J., and May and Greer, JJ.

**GREER, Judge.**

Andrew Lesher and Taylor Hansen are the never-married parents of G.H., who was born in the summer of 2018.  In February 2019, Andrew filed a petition for paternity, custody, and visitation.  Each parent asked the court to award them physical care of G.H.[1]  Following a two-day hearing in September 2019, the district court gave Andrew physical care of G.H. and awarded Taylor visitation with him.  On appeal, Taylor maintains she should be given physical care of G.H.  Andrew cross-appealed; he urges us to leave G.H. in his physical care and asks that we change G.H.'s surname to "Lesher" or, in the alternative, "Lesher-Hansen."

### I.  Background Facts and Proceedings.

Taylor and Andrew began dating in 2016.  Shortly thereafter, Taylor and her son from a previous relationship, K.E., who was born in 2013, moved into Andrew's home.  Andrew and Taylor's relationship was volatile, and Taylor and K.E moved out of Andrew's home more than once.  At the time of G.H.'s birth, in August 2018, Taylor and K.E. had only recently returned to living with Andrew.  This reconciliation was short-lived.  About a week after G.H. was discharged from the hospital—while Andrew was at work and without his knowing—Taylor moved out of Andrew's home, taking G.H. and most of his belongings with her.

For the next few months, Taylor controlled Andrew's access to G.H.  Andrew was only allowed to visit G.H. at Taylor's parents' home, where she had moved.  He was not allowed to return to his home with G.H., and Taylor controlled

---

[1] Andrew requested joint physical care in the alternative.

who he brought with him to visit the child—even excluding the paternal grandparents from visiting.

In early December, Andrew was spending time with G.H. at Taylor's parents' home when Andrew asked about taking G.H. to spend time with his family over Christmas. According to Taylor's testimony at the custody hearing, she told Andrew she "wasn't going to let him take [G.H.] for a period of time." When Andrew became upset at this, Taylor's mother told Andrew he had to leave and Taylor tried to remove G.H from Andrew's arms. Andrew resisted, stating he would like a chance to say goodbye to his son first. At some point, Taylor's mother struck Andrew in the head.[2]

Andrew left and contacted the local police. They took photos of Andrew and filed a complaint against Taylor's mother for assault causing bodily injury. Taylor's mother was never criminally charged, but the Iowa Department of Human Services filed a founded child-abuse report, concluding Taylor's mother assaulted Andrew in front of K.E. and G.H.

The next day, Taylor filed for a civil protective order against Andrew, alleging he "shoved her away from her child," "threatened to kill himself," and "threatened to take the child" the previous day. No final hearing was ever held on this request, and Andrew was not allowed to see G.H. until March, when a temporary stipulation was reached.

---

[2] Taylor and her mother admit the mother struck Andrew in the head. Andrew also alleged the mother strangled him, and K.E. seemed to corroborate this account when he spoke to the Iowa Department of Human Services worker, telling her his mom had to stop the grandmother when she put both of her hands on Andrew's neck and that his grandmother hit Andrew. At the custody hearing, Taylor and her mother denied that the mother choked Andrew.

In April, the district court entered a temporary order pending the hearing on Andrew's petition for paternity, custody, and visitation. Under the temporary order, Taylor was given physical care of G.H. and Andrew was given weekly parenting time from 6:00 p.m. on Saturdays until 7:00 p.m. on Sundays and 6:00 p.m. on Wednesdays until 7:00 p.m. on Thursdays.

The hearing on the custody petition took place in September. Both Taylor and Andrew attempted to paint the other in a negative light; each alleged the other was the physical aggressor and they were the victim of physical abuse in their relationship. Still, their testimony established that, after the temporary order was entered, they were able to communicate about G.H. and the transfer for visitation generally went well. Both parents value their time with G.H., and neither Andrew nor Taylor raised any serious concerns about the other's ability to parent G.H. safely. At the close of the hearing, the court amended the temporary order to increase Andrew's visitation time—giving him one extra overnight each week.

Pursuant to the court's November 25 decree, Andrew was given physical care of G.H. and Taylor was given visitation. The court denied Andrew's request to have G.H.'s surname changed to Lesher or Lesher-Hansen, concluding it only had the authority to make the initial determination regarding a child's name whereas this would constitute a name change.

Taylor appeals the physical-care provision, and Andrew cross-appeals the court's ruling regarding G.H.'s surname.

**II. Standard of Review.**

The district court tries custody matters in equity, so we review the proceedings de novo. *See* Iowa R. App. P. 6.907. We give weight to the district

court's fact findings, but we are not bound them. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016).

### III. Discussion.

**A. Physical Care.** Taylor maintains she should be given physical care of G.H. instead of Andrew. "It is axiomatic that we are concerned above all else in child custody cases with the best interests of the child." *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). "The objective of a physical care determination is to place the child[] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). The legal analysis for physical-care decisions is the same for never-married parents as it is for once-married parents. *Lambert*, 418 N.W.2d at 42. And gender and sex have no bearing on our decision; neither parent has a greater burden than the other in attempting to gain physical care. *Cf. In re Marriage of Ullerich*, 367 N.W.2d 297, 299 (Iowa Ct. App. 1985). We do not resolve physical-care issues "based upon perceived fairness to the [parents], but primarily upon what is best for the *child*." *Hansen*, 733 N.W.2d at 695.

While Andrew asked the district court to consider joint physical care in the alternative, he does not renew that request on appeal. *See* Iowa Code §§ 598.41(5)(a) (2019) (providing that the district "court may award joint physical care to both joint custodial parents *upon the request of either parent*" (emphasis added)), 600B.40(2) (making section 598.41 applicable when "determining the visitation or custody arrangements of a child born out of wedlock"). So we must pick one of the two parents to be G.H.'s main caregiver. *See Hansen*, 733 N.W.2d at 695–96. When determining who should have physical care of G.H., we consider

"stability and continuity with an eye toward providing the [child] with the best environment possible for [the child's] continued development and growth." *Id.* at 700. "[T]he factors of continuity, stability, and approximation are entitled to considerable weight." *Id.* And "the parent responsible for providing physical care [must] support the other parent's relationship with the child." Iowa Code § 598.41(5)(b).

Taylor provided most of the care for G.H. from his birth through the time of the district court hearing in September 2019. *See Hansen*, 733 N.W.2d at 697 (defining the approximation rule as the parents' caregiving being "in rough proportion to that which predated" the court's involvement). However, she became the primary caregiver by removing herself and G.H. from Andrew's home and then controlling Andrew's access to G.H. From when she first moved out with G.H., in early August 2018, until she obtained the no-contact order, in early December 2018, Andrew visited G.H. often and asked for one-on-one time with G.H. Taylor refused all of Andrew's requests. *See In re Marriage of Daniels*, 568 N.W.2d 51, 56 (Iowa Ct. App. 1997) ("A parent's denial of visitation without just cause is a significant factor in determining the proper custody arrangement."). She testified at trial that she could not let Andrew take G.H. because she was breastfeeding the child, but we note that she did leave G.H. in Andrew's care while she was not there—she just refused to let Andrew leave with G.H. when he wanted to. As the district court found, Taylor used breastfeeding as a weapon. And her choice to be unduly restrictive of Andrew's parenting time with G.H. shows a lack of support for their relationship.

Also like the district court, we believe Andrew can provide G.H. with more stability than Taylor can. Taylor's older child lived in three or four homes and attended three or four daycares before he started preschool. He missed twenty-four days of preschool, and, the next year, he missed seventeen days of kindergarten. We acknowledge Taylor's testimony that she intends to stay long-term in the home she moved into a few months before the custody hearing. But we also rely on the principle that, "in family law matters, past performance is a strong indicator of what is yet to come." *Hensch v. Mysak*, 902 N.W.2d 822, 825 (Iowa Ct. App. 2017). On the other hand, Andrew owned and lived in his home for several years, and he maintained a job with the same employer for more than a decade. He lives in the same community as his parents, with whom he shares a close relationship, and he intends to remain in that community.

Taylor has physical care of K.E., who is G.H.'s half-sibling, and this factor weighs in her favor for having physical care of G.H. as well. *See In re Marriage of Orte*, 389 N.W.2d 373, 374 (Iowa 1986) (applying the principle of keeping children together to half-sibling relationships). "However, this principle does not mandate a parent with physical care of a half-sibling be awarded physical care of the child at issue despite other compelling factors militating against an award of physical care to that parent." *Van Gundy v. Bolton*, No. 18-1838, 2019 WL 2145848, at *3 (Iowa Ct. App. May 15, 2019) (collecting cases). This factor does not outweigh the other factors that support Andrew having physical care of G.H.

In the past, when they were still in a romantic relationship, both Taylor and Andrew were emotionally and physically abusive toward each other. As we are sure these parents are aware, "[d]omestic abuse is, in every respect, dramatically

opposed to a child's best interests." *See Daniels*, 568 N.W.2d at 55. The district court found the evidence generally corroborated Andrew's versions of Taylor's manipulation in the relationship. Sadly some of Taylor's behaviors reflect poor choices directly affecting her support of G.H.'s relationship with Andrew. We affirm the district court ruling giving Andrew physical care of G.H., but as these parents share legal custody of the child, they will continue to be a part of each other's lives going forward. Their interactions involving G.H. seemed generally positive under the temporary order, and we expect that will continue.

**B. Surname.** On cross-appeal, Andrew challenges the district court's conclusion it did not have the authority to change G.H.'s surname.

"When we examine our custody statute, Iowa Code section 598.41, we believe that authority to change a child's name may be inferred." *In re Marriage of Gulsvig*, 498 N.W.2d 725, 728 (Iowa 1993) (recognizing the statute "provides the court with broad discretion in determining custody and the physical care of a child"). And while this action involves unmarried parents, requiring the action for paternity, custody, and visitation to be brought under chapter 600B instead, the district court has the authority under section 600B.40 "to consider and enter a ruling on a child's legal status, including the determination of the child's surname." *Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005).

When the court is asked to make an initial determination of a child's name, "neither parent has a superior right in determining the child's last name" and the governing consideration is the child's best interests. *Id.* at 707–08. But, if the court is being asked to make a name change, then Iowa Code chapter 674 controls. Pursuant to section 674.6, if the child is under fourteen, both parents listed on the

birth certificate must consent to the name change or must prove one of the listed reasons that the court may waive consent.

Here, the district court determined Andrew was asking for a name change rather than an initial determination and concluded it did not have the authority to change G.H.'s name. It relied upon *Peckosh v. Wenger*, No. 11-0119, 2011 WL 4578532, at *5 (Iowa Ct. App. Oct. 5, 2011), in reaching this conclusion. In *Peckosh*, a panel of our court found the father was requesting a name change because, at the hospital, the parties' negotiated the child's name. 2011 WL 4578532, at *1. The court concluded the child's "surname on her initial birth certificate was not a unilateral decision by [the mother]. Rather, [the father] had equal participation in determining [the child's] legal status/surname on this birth certificate." *Id.* at *5.

We acknowledge that Andrew contends that although he signed G.H.'s birth certificate, Taylor unilaterally chose G.H.'s surname. Andrew testified he did not agree to the last name and only signed the birth certificate a few days later out of fear G.H. would not be covered on his insurance if he did not sign it. Taylor testified differently. She testified Andrew "was fine" with the surname, but she also testified that she gave G.H. his last name just as she told Andrew she would. But, like the situation in *Peckosh,* both parties signed the birth certificate establishing the child's current surname. *See id.* at *1–2. And the district court found it was "clear from the evidence that [Andrew] participated in making the choice." Because this is not an initial determination of the child's name, Andrew's only option to do so was under the guidelines of Iowa Code chapter 674.

**IV. Conclusion.**

We affirm the district court ruling giving Andrew physical care of G.H. and adopt the reasoning of the court about its authority to change G.H.'s surname.

**AFFIRMED ON BOTH APPEALS.**