# IN THE COURT OF APPEALS OF IOWA

No. 20-0143
Filed August 18, 2021

**TANNER D. VARNER,**
    Plaintiff-Appellee,

**vs.**

**LAUREN E. CONWAY,**
    Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Robert B. Hanson, Judge.

Lauren Conway appeals the modification of a custody order. **AFFIRMED AS MODIFIED AND REMANDED.**

Tara M. Elcock of Elcock Law Firm, PLC, Indianola, for appellant.

Catherine C. Dietz-Kilen of Harrison & Dietz-Kilen, P.L.C., Des Moines, for appellee.

Annie von Gillern of von Gillern Law Firm, PLC, Urbandale, guardian ad litem for minor child

Heard by Bower, C.J., and Tabor and Ahlers, JJ.

**BOWER, Chief Judge.**

Lauren Conway appeals a modification of the custody order of her child with Tanner Varner. Lauren challenges the award of physical care to Tanner, the visitation provision, child support, attorney fees, and other issues. Tanner raises two evidentiary issues though he did not cross-appeal. The child's guardian ad litem (GAL) challenges the court's physical-care determination and how it addressed the GAL's position in its ruling. We affirm the court's ruling as modified and remand for the district court to recalculate child support.

**I. Procedural History.**

Lauren and Tanner are the parents of M.V., born in 2010. In 2015, the parties entered into a stipulated paternity decree and custody agreement placing the child in the parents' joint legal custody and joint physical care.[1] Every week on Monday and Tuesday the child was in Lauren's physical care, and on Wednesday and Thursday the child was in Tanner's physical care. They alternated weekends of Friday through Sunday. At the time of the stipulation, neither party had much income, and both agreed Tanner would pay Lauren about $120 a month in child support.

In January 2018, Tanner filed a petition to modify seeking physical care of the child and child support. Lauren contends circumstances have not changed substantially to merit a change in care, but if they have, she requests physical care, child support, and attorney fees.

---

[1] There was no custody or child support agreement before 2015. Tanner and Lauren ended their relationship in 2012, and the child was mainly in Lauren's care while Tanner moved around the country. Tanner paid little child support.

Following mediation in early April, the court appointed a GAL concerning all matters related to the child. The modification trial occurred in February and May 2019, spanning eight days. The court filed its decree on October 9. In January 2020, the court denied a motion to reconsider, which was filed by Lauren and joined by the GAL.

The district court determined shared physical care was not in the child's best interests. The court found the stability and structure of Tanner's home was superior to the inconsistency and history of irresponsibility of Lauren's care. The court awarded Tanner physical care. The court did not modify the days of care from the stipulation, but shortened Lauren's visitation periods on school nights to end at 7:30 p.m. rather than going overnight. When school is not in session, the child stays overnight with Lauren on the week night visits as well as her weekends.

In calculating child support, the court imputed to Tanner an income of $39,000, concluding his earning capacity was "at least equal to that of Ms. Conway." The court ordered court costs and the GAL fees split equally and for each party to be responsible for their own attorney fees. Lauren appeals.

**II. Background Facts.**

M.V. is generally described as a happy, energetic, and loving child. The child's primary extracurricular activity is gymnastics, with practice three nights a week from 4:30 to 7:30 p.m. and weekend team competitions. Both parents are supportive of her participation in gymnastics. The child also participates in other extracurricular activities. The child is loved by immediate and extended family on both sides.

Tanner has a college degree in exercise science. From 2007 through 2016, Tanner pursued a career in professional arena football, often based in distant cities with extensive travelling.[2] Around his sports seasons, Tanner worked temporary jobs, including as a loan document specialist, a security guard, and a substitute teacher. Since early 2017, Tanner has worked part-time in passenger services for an airline and plans to train as a pilot. His part-time employment status—working from 4:00 to 9:30 a.m. five days a week—is by choice, and he could readily find full-time employment in a wide variety of jobs. At his current pay rate, he would make about $20,000 per year full-time. In 2018, Tanner married, and his spouse's financial support allows Tanner to spend more time with the child and participate in school events. His spouse pays for the child's gymnastics. She helps get the child to school in the mornings and transports her to and attends extracurricular activities. Tanner and his spouse live in Urbandale within the Waukee school district boundaries.

Lauren has worked several different jobs since M.V.'s birth. Beginning in the fall of 2018, she has worked full-time as a manager-in-training at a retail store. Her gross income is approximately $39,000 per year. Her income is enough to pay her living expenses, and she lives in an apartment in West Des Moines, also within the Waukee school district. She has had periods of employment, income, housing, and transportation insecurity—including late 2017 into early 2018. During

---

[2] The arena football season runs from March to August, but Tanner tried to travel back to Iowa regularly and his parents would bring the child to visit him. Tanner's parents took care of the child on Tanner's scheduled care days.

the time Lauren's transportation was unreliable, the child was sometimes tardy to school on mornings after overnights with Lauren.

In 2017, Tanner and Lauren stopped co-parenting effectively, and their communications devolved into snarkiness, hostility, deliberate misunderstandings, and a general unwillingness to help each other. Neither parent does well at communicating plans or schedules to the other, but both believe they are better at sharing information than the record shows. Both parents seem to conveniently forget things they do wrong or the other parent might do well. The parents' conflict made the child anxious, and as trial approached, the child told adults different stories due to her anxiety. Nevertheless, the parents each believed the child over the other parent.

Tanner and Lauren have very different parenting styles. Tanner is "very structured" and operates according to a schedule. Lauren is "free-spirited" and at times has struggled with punctuality and structure for the child. The parents' extended families used to get along, but as hostilities rose during these proceedings, these relationships deteriorated. The child's therapist indicates the child feels stuck in the middle between the parents, and the child has told other adults she wishes her parents would just get along.

### III. Standard of Review

We review proceedings tried in equity de novo. *Lambert v. Everist*, 418 N.W.2d 40, 42 (Iowa 1988). We review the entire record and adjudicate the issues properly presented anew. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). However, because the district court had the opportunity to hear the

evidence and view the witnesses firsthand, we give weight to the district court's findings even though they are not binding. *See* Iowa R. App. P. 6.904(3)(g).

### IV. Analysis

Iowa Code chapter 600B (2018) governs cases of paternity, custody, visitation, and support between unmarried parties. *Montgomery v. Wells*, 708 N.W.2d 704, 707 (Iowa Ct. App. 2005). Courts may modify the custodial terms of a paternity decree "when there has been a substantial change in circumstances since the time of the decree, not contemplated by the court when the decree was entered, which was more or less permanent, and relates to the welfare of the child." *Melchiori v. Kooi*, 644 N.W.2d 365, 368 (Iowa Ct. App. 2002). Section 600B.40 directs the court to apply the factors found in Iowa Code section 598.41— governing custody of children in marriage dissolution cases—to custody and visitation arrangements for children of unmarried parents. Child support obligations are also determined as they are in marriage dissolution cases. Iowa Code § 600B.25(1) (referring the court to section 598.21B for child support).

**A. Physical Care.** At trial, each parent sought physical care of the child. The objective of a physical care determination "is to place the child[ ] in the environment most likely to bring them to health, both physically and mentally, and to social maturity." *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007). The parent seeking to modify a physical care provision must prove a substantial change in circumstances since the decree and must show "a superior ability to minister to the needs" of the child. *In re Marriage of Harris*, 877 N.W.2d 434, 440 (Iowa 2016).

The district court concluded joint physical care was no longer in the child's best interests as was contemplated at the time of the original decree. Considering the communications and conflict reflected in the record, we agree. *See Melchiori*, 644 N.W.2d at 368 ("Discord between parents that has a disruptive effect on children's lives has been held to be a substantial change of circumstance that warrants a modification of the decree to designate a primary physical caregiver if it appears that the children, by having a primary physical caregiver, will have superior care.").

"When joint physical care is not warranted, the court must choose one parent to be the primary caretaker, awarding the other parent visitation rights." *In re Marriage of Hynick*, 727 N.W.2d 575, 579 (Iowa 2007). Tanner and Lauren shared care of the child for many years, and either would be suitable as the primary care parent. *See Melchiori*, 644 N.W.2d at 368. "[T]he petitioning parent has the burden to show that the change he advocates will give [the child] superior care." *Id.* at 369.

Tanner has recently had a more stable life situation, largely due to his spouse, and uses a more structured parenting style than Lauren. His reliability and ability to devote significant time to parenting the child are important factors weighing in his favor as physical care giver. However, we do have concerns about his willingness to maintain the child's relationship with Lauren and his ability to nurture the child's emotional growth.[3] Tanner admitted to making derogatory comments about Lauren but denied it was around the child. He does not appear

---

[3] Tanner was also combative with the child's GAL and, during his testimony, accused her of dishonesty and not working in the child's best interests.

to understand how the child could internalize these criticisms. Tanner also faults Lauren for not having the same financial resources he does to pay for the child's extracurricular activities—though he admits he could not pay for those same activities without the support of his spouse. He makes little effort to ensure Lauren receives communications he receives automatically—for example, listing his spouse as the second parent or emergency contact at school and gymnastics studios instead of Lauren. He did not discuss with Lauren the child's change in schools[4] or starting the child in therapy. Yet he describes his support of Lauren's relationship with the child at a ten out of ten, which suggests a lack of self-awareness.

For her part, Lauren struggles with balance and planning. In the two years before Tanner filed for modification, she did not always get the child to school on time, resulting in many tardies.[5] The child's schoolwork was not always completed on evenings Lauren had overnight care. Lauren has lost a number of jobs and was evicted from an apartment in the period after the stipulation, leading to the add-on effects of financial insecurity. However, by the time of trial, Lauren had reliable employment, housing, and transportation and was getting the child to school on time. She was at times careless about pick-up and drop-off times when

---

[4] The child's school district was based on Tanner's residence, and she was automatically moved to a different elementary school when Tanner moved into his wife's home.

[5] The child is able to take a school bus from Tanner's house to get to school. Lauren does not live in the same elementary school district and needs to take the child to school in the morning. Lauren testified most tardies were only a few minutes.

exchanging the child with Tanner and his family and occasionally ignored communications from Tanner.

The best interests of the child would be for Tanner and Lauren to work together to bring up the child in the best manner for her long-range interests instead of treating her as a prize to be won. Unfortunately, the parents' poor behavior and blame-throwing means shared care is not feasible. We find Tanner is in a better position to provide the structure and consistency recommended by the child's therapist. We agree with the district court's determination awarding physical care to Tanner.[6]

*Visitation.* The district court set Lauren's school-night visitations—Sunday, Monday, and Tuesday evenings—to end at 7:30 p.m.[7] Lauren requests the evening visits be overnights—essentially the same as the current shared-care arrangement—arguing she is otherwise just transportation for the child's activities. Tanner counters the child does not currently have gymnastics on Tuesdays, and Lauren has sufficient contact with the child through the modified visitation. The GAL—whose statutory-imposed concern is the best interests of the child— proposed a balanced visitation schedule.

The court is to order "liberal visitation rights . . . which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." Iowa Code § 598.41(1)(a); *see also In re Marriage of Matteson*, No. 16-0401, 2017 WL 361999, at *3 (Iowa Ct. App. Jan. 25, 2017) ("Generally,

---

[6] The placement of physical care with Tanner includes the statutory requirement that he support the child's relationship with Lauren as well as respect Lauren's rights as joint legal custodian of the child. *See* Iowa Code § 598.41(5)(b).

[7] When the child does not have school the next day, these visits are overnight.

liberal visitation rights are considered to be in children's best interests."). "[U]nless midweek visitation with the non-physical care parent is unduly disruptive, such visitation is appropriate where the parents live in close proximity to each other." *In re Marriage of Schear*, No. 10-1129, 2011 WL 444588, at *6 (Iowa Ct. App. Feb. 9, 2011); *see In re Marriage of Toedter*, 473 N.W.2d 233, 235 (Iowa Ct. App. 1991) (recognizing a healthy parent-child relationship is to be "encouraged and nourished" and granting overnight visitation during the week). Visitation should include time during the week to allow the non-physical-care parent the chance to be involved in the child's day-to-day activity. *See In re Diaz*, No. 14-1998, 2015 WL 3876771, at *4 (Iowa Ct. App. June 24, 2015).

The child already has a busy extracurricular schedule filling many school-night evenings. Activity schedules change over time and participation often increases as the child gets older. *See Gehringer v. Bloom*, No. 20-0250, 2020 WL 6157815, at *3 (Iowa Ct. App. Oct. 21, 2020) (finding increased extracurricular participation affecting visitation "may not constitute a material change in circumstances meriting a modification"). Lauren expresses a valid concern over the quality of her midweek visitation with the child going forward, as this modification already contemplates significant extracurricular participation. We see little evidence to suggest Tanner would show flexibility in the future to increase Lauren's visitation in response to changes or expansions in the child's extracurricular activity schedule filling the modified visitation evenings.

We conclude an overnight visit each week is in the best interests of the child and will aid in maximizing the emotional contact between Lauren and the child. We modify the visitation schedule for Tuesday evenings, adjusting the end time to

when the child must report to school on Wednesday mornings or, when school is not in session, to 10:00 a.m. on Wednesday.

**B. Child Support**. Lauren contends the court should have considered the total household income and imputed a higher income to Tanner in determining child support payments.[8] In support, she cites cases where the courts have refused to allow a parent to reduce their child support obligation due to a voluntary decrease in income where the obligor relies on a spouse's income.

Iowa Code section 598.21B(2)(c) establishes a rebuttable presumption the amount of support specified by Iowa's child support guidelines is the correct amount to be awarded. A variation from the guidelines requires "a record or written finding . . . that the guidelines would be unjust or inappropriate as determined under the criteria prescribed by the supreme court." Iowa Code § 598.21B(2)(d).

> In making this equitable determination, the court must make written findings using the following criteria: (1) substantial injustice would result to the payor, payee, or child; (2) adjustments are necessary to provide for the needs of the child and to do justice between the parties, payor, or payee under the special circumstances of the case; and (3) circumstances contemplated in Iowa Code section 234.39.

*In re Marriage of Combs*, No. 02-1053, 2003 WL 21458558, at *4 (Iowa Ct. App. June 25, 2003); *see* Iowa Ct. R. 9.11. We have tangentially considered a spouse's income where a noncustodial spouse has voluntarily reduced their income, and the courts have refused to lower the parent's support obligation, imputing the original income as earning capacity. *See, e.g.*, *In re Marriage of McKenzie*, 709 N.W.2d 528, 533–34 (Iowa 2006); *In re Marriage of Dawson*, 467 N.W.2d 271, 275–76 (Iowa 1991); *Combs*, 2003 WL 21458558, at *5.

---

[8] The court imputed Tanner's earning capacity as equal to that of Lauren.

While we understand the reasoning behind Lauren's argument, our case law is clear:

> [T]he support obligation of a noncustodial parent should not be reduced to an amount less than that provided for under the child support guidelines because a stepparent . . . makes contributions to the household. The contribution of the stepparent . . . is only relevant to the extent his or her contribution may increase the cost of the child's maintenance by reason of the higher standard of living the children may experience by reason of him or her being in the home.

*In re Marriage of Keopke*, 483 N.W.2d 612, 614 (Iowa Ct. App. 1992); *see also In re Marriage of Gehl*, 486 N.W.2d 284, 287 (Iowa 1992) ("We also conclude that the court was correct in determining that the annual income of Susan's husband Earl was not a 'special circumstance' which otherwise justified departure from the child support guidelines."). We do not impute his wife's income to Tanner.

The district court imputed to Tanner an income equal to Lauren's for purposes of calculating child support under the guidelines. Tanner has never held a long-term full-time job with stable income due to his football schedule and, since the end of his sports career, has been able to work part-time and devote a significant amount of time to the child. Therefore, the court could not use past income as a reliable indicator of his earning capacity. The court based Tanner's imputed income on "his education and experience and because the same is necessary to provide for the needs of the child and to do justice between the parties." We make no change to Tanner's imputed income.

While we do not impute his wife's income to Tanner, we recognize he makes extracurricular choices for the child based on the household income and without regard for Lauren's financial ability to equally contribute. If either parent chooses to enroll the child in extracurricular classes, teams, or training without prior written

agreement to share costs from the other parent, the enrolling parent shall pay any costs associated with that activity.

While we have not modified Tanner's income for the calculations, we have adjusted the number of overnights Lauren will parent the child each year, which may trigger the application of the "extraordinary visitation credit" to her child-support obligation. *See* Iowa Ct. R. 9.9 (providing a percentage credit to noncustodial parents who parent their children for at least 128 overnights per year). We remand to the district court to recalculate Lauren's child support obligation.

**C. Guardian ad Litem.** The GAL argues the district court committed reversible error by failing to consider or address her position in the modification ruling. The statutory purpose of a GAL is to represent the best interests of the minor child. Iowa Code § 598.12(1). The GAL participates in the proceedings and may propose requested relief, but does not testify, serve as witness, or file a written report to the court. *Id.*

Significant items in the GAL's requested relief include awarding Lauren physical care with the parents continuing with an equal number of overnights with the child, the use of a parenting coordinator, and a detailed parenting plan. The GAL "in no way suggest[s] that [GAL]'s positions should be dispositive, but . . . not referencing, even to disagree with the [GAL]'s position, creates a system where under the new statute the position of the [GAL] will become superfluous."

The GAL's position on the best interests of the child is highly relevant in a physical-care determination, and we consider the requested relief in that context on our de novo review.

The GAL here actively participated throughout the proceedings, presented evidence to the court, and worked with both parents and the child. The GAL cites no authority supporting her argument the court's failure to address her concerns was reversible error. It may have been better practice for the court to address the GAL's requested relief in its best–interests-of-the-child analysis, but the court's failure to mention the GAL's position does not constitute reversible error.

**D. Miscellaneous.**

*Parenting coordinator.* Lauren seeks the appointment of a parenting coordinator and asks Tanner be responsible for three-fourths of the cost. She cites no authority to support her request, though the GAL and the child's therapist agreed it could be beneficial. Tanner appears to oppose the appointment of a parenting coordinator. Without cooperation by both parents, the appointment of a parenting coordinator will not fix the problems between the parents. *See In re Marriage of Saluri*, No. 12-1279, 2013 WL 2397822, at *4 (Iowa Ct. App. May 30, 2013)

We decline to order the parties use a parenting coordinator, but strongly recommend the parties consider a similar intermediary to improve their communication and cooperation for the sake of the child. A shared calendar may also aid the parents in providing school and activity schedules and locations, family events they would like the child to attend, as well as trip itineraries.

*Contact documentation.* On appeal, Lauren also requests we require Tanner list her first and himself second on any documents relating to the child, and that no step-parent be listed. Each parent should be listing the child's biological parents as the top contacts on any document relating to the child as part of

assuring equal rights of the parents as joint legal custodians and ensuring both parents are able to support the child in development, education, and activities. The request to not list stepparents as a parental contact has no grounds in law and would only serve to hinder communication and support for the child.

*Right of first refusal.* Lauren seeks a right of first refusal when Tanner is unable to provide physical care for the child. Tanner does not address this claim on appeal; in his resistance to the request in Lauren's motion to reconsider, he stated any such provision should apply mutually to both parties, but that it would increase acrimony here and the court should not order the provision. The district court did not address this issue in either its decree or the order denying Lauren's motion to reconsider.

Seeking to assure the child maximum contact with both parents, and liberal visitation when in the best interests of the child, we have approved a "right of first refusal" provision when the need for child care will exceed a specified time. *See, e.g.*, *In re Marriage of Klemmensen*, No. 14-1292, 2015 WL 2089699, at *3–4 (Iowa Ct. App. May 6, 2015) (approving a right of first refusal when the child would be with a substitute care provider for more than twelve hours); *In re Marriage of Bevers*, No. 14-0875, 2015 WL 1332578, at *4 (Iowa Ct. App. Mar. 25, 2015) (amending a provision to allow the party without the children the first opportunity of care when a parent is unavailable for four hours or longer); *In re Marriage of Lauritsen*, No. 13-1889, 2014 WL 3511899, at * (Iowa Ct. App. July 16, 2014) (modifying a right of first refusal for when child care is needed for over twelve hours). In cases where the parties have "less than ideal communication," certainty in the schedule is key to making the arrangement work. *See Dirks v. Eccles*,

No. 19-0994, 2020 WL 2071116, at *3–4 (Iowa Ct. App. Apr. 29, 2020) (declining to add the provision because, while the parents could work together under a set schedule, "adding uncertainty would only complicate matters and create stress and animosity between the parties"); *In re Marriage of Gray*, No. 13-0815, 2014 WL 955375, at *2 (Iowa Ct. App. Mar. 12, 2014) (affirming a provision transferring the child to care of the parent with visitation when the parent with physical care needed to be gone more than forty-eight hours for employment but also granting the custodial parent at three consecutive days upon return even if it conflicts with normal visitation).

This modified decree has resulted in Lauren losing a significant number of overnight visits. If Tanner is going to leave town for more than twenty-four hours during his care time without taking the child with him, the child should be able to spend the extra time with Lauren. Fairness suggests the provision apply equally. Therefore, when either biological parent knows they will be leaving town during their care time and unable to personally care for the child for more than twenty-four hours, they must offer the time to the other parent at least two weeks before the expected departure.

*Hearsay objections.* Tanner claims the district court should have sustained hearsay objections to several documents submitted by Lauren at trial.[9] This trial was in equity, and "the court did not need to rule on objections, but could hear all evidence subject to objections." *Wilker v. Wilker*, 630 N.W.2d 590, 597 (Iowa

---

[9] "[A] successful party need not cross-appeal to preserve error on a ground urged but ignored or rejected in trial court. This is because a party need not, in fact cannot, appeal from a favorable ruling." *Johnson Equip. Corp. of Iowa v. Indus. Indem.*, 489 N.W.2d 13, 16 (Iowa 1992).

2001). Three of the exhibits Tanner objects to were statements regarding Lauren's prior employment. The fourth exhibit is an email written by the GAL, which Tanner claims was meant to avoid the statutory prohibition on a GAL filing a report in the matter. We find no suggestion the district court relied on any information in the exhibits in reaching its decision. And we do not rely on the challenged information in our decision, so we need not determine their admissibility. *See id.* at 598 ("The question of admissibility is not controlling . . . [if] we arrive at the same result on the merits of the appeal with or without that evidence, under our de novo review." (citation omitted)).

*Negative inference.* Tanner also claims the court should have made a negative inference relating to credibility due to a portion of Lauren's testimony. After eight days of trial, including multiple days of testimony by each parent, the court had more than enough information to evaluate each parent's credibility but made no express findings as to the credibility of either. Tanner points to nothing in the record indicating whether the court did or did not make his proposed permissive inference, and we refuse to speculate either way. Given the circumstances of this case, we find it unnecessary to examine the appropriateness of the inference.

### E. Attorney's Fees.

*Trial attorney fees.* Iowa Code section 600B.26 provides "the court may award the prevailing party reasonable attorney fees" in a custody or visitation modification action. Thus, an attorney fee award is within the discretion of the court "and we will not disturb its decision absent a finding of abuse of discretion." *Markey v. Carney*, 705 N.W.2d 13, 25 (Iowa 2005) (citation omitted). Lauren was

not the prevailing party on the primary issue in this modification, so there is no abuse of discretion in the district court not awarding her attorney fees.

*Appellate attorney fees.* Both Lauren and Tanner seek appellate attorney fees. "Appellate attorney fees are not a matter of right but may be awarded as a matter of discretion." *Hensch v. Mysak*, 902 N.W.2d 822, 827 (Iowa Ct. App. 2017). "In determining whether to award appellate attorney fees, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the decision of the trial court on appeal." *Id.* Based on these factors, we decline to award appellate attorney fees to either party.

*Court costs and trial GAL fees.* Lauren asks that Tanner be responsible for the GAL's trial fees. GAL fees are governed by statute, which specifies the fees "shall be charged against the party responsible for court costs unless the court determines that the party responsible for court costs is indigent." Iowa Code § 598.12(3). The district court split court costs and the GAL fees equally. As neither Lauren nor Tanner is indigent, we affirm the district court's order.

*GAL appellate fees.* The GAL requests her appellate fees be covered by the parties, split equitably between them. The GAL was appointed pursuant to Iowa Code section 598.12. The district court discharged the GAL from her duties when it entered the modification. The court reappointed the GAL for the appeal "through issuance of final procedendo" and ordered fees pursuant to section 598.12(3). We order the GAL's appellate fees split equitably between the parties. Any remaining court costs shall also be split equally.

**AFFIRMED AS MODIFIED AND REMANDED.**